Daniel J. LYONS, d/b/a Ludlow
Service Station

v.

MOBIL OIL CORPORATION.

Civ. No. B–81–406.

United States District Court,
D. Connecticut.

Nov. 12, 1981.

Richard W. Farrell, Albert J. Barr, Abate, Fox & Farrell, Stamford, Conn., for plaintiff.

William E. Glynn, Scott P. Moser, Andrew P. Nemiroff, Day, Berry & Howard, Hartford, Conn., for defendant.

## OPINION

EGINTON, District Judge.

Plaintiff filed this action against the defendant seeking damages, a declaratory judgment and injunctive relief. The complaint alleges that defendant has terminated the franchise relationship between the parties in violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* (PMPA) and Connecticut General Statutes § 42–133e *et seq.* The Connecticut statute need not be considered. To the extent it differs from the PMPA, it is expressly preempted. 15 U.S.C. § 2806(a). The matter currently before the court is plaintiff's motion for a preliminary injunction. This motion has been granted, and the court hereby files its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

FINDINGS OF FACT

1. Plaintiff is an independent service station dealer, doing business as Ludlow Service Station, operating a Mobil service station located at 219 East Avenue, Norwalk, Connecticut. The defendant, a New York corporation, is a major refiner of petroleum products. Defendant is engaged in the sale and distribution of oil, gasoline and gasoline-related products under the "Mobil" trade name or trademark to franchise retailers in the state of Connecticut. It is a franchisor under the provisions of the PMPA.

2. Plaintiff operates the station pursuant to a service station lease, retail dealer contract and letter of understanding covering a term from October 19, 1979 through October 18, 1982. The station was formerly operated by William D. Melillo until his death, following a brief illness, on June 3, 1979.

3. On June 4, 1979, John J. McNally, defendant's marketing representative for lower Fairfield County, took an inventory of the products at the station, secured the station's premises by placing locks thereon, made arrangements to remove the gasoline from the station's underground tanks, and made arrangements to have the station's utilities placed in defendant's name.

4. Plaintiff, among others, contacted defendant regarding the possibility of becom-

ing the dealer at the station. McNally told plaintiff that because of legal problems relating to the station, defendant could not lease the station at that time, but the plaintiff would receive an application form. The problem to which McNally referred concerned the Melillo estate's claim that the provision in the lease between Melillo and defendant that provided for termination of the lease upon Melillo's death was invalid by reason of Connecticut General Statutes § 42–133m(b).

5. In early July, 1979, McNally met with plaintiff to discuss plaintiff's application. Plaintiff was told that although defendant still faced legal problems with the location, it would be seeking a candidate for station operation as soon as there existed "the legal okay to go ahead. . . ."

6. The Melillo estate instituted suit against defendant on July 17, 1981. Thereafter, on or about July 19 or July 20, 1981, plaintiff met with McNally to discuss plaintiff's interest in the station. At that time, plaintiff was advised of the suit concerning the station.

7. McNally received plaintiff's application, along with several letters of recommendation, on or shortly after July 24, 1979. On July 25, plaintiff met with defendant's representatives to discuss his application. On that date, several candidates for the station operation met with defendant's representatives. Plaintiff was told at that meeting that the dealer could lose the right to operate the station if the defendant were to lose the suit brought by Melillo's estate.

8. Plaintiff and four other candidates met with McNally, Steve Brigati and Jack H. Mason, three representatives of the defendant, on August 16, 1979 at the Norwalk Holiday Inn. Plaintiff was told that the litigation involving the station was still pending.

9. On August 17, 1979, McNally contacted the plaintiff to inform him that he would be selected as the dealer candidate. Three days later plaintiff met with McNally to prepare for plaintiff's enrollment in defendant's dealer-training school. At that time, plaintiff was informed that he would have to begin his training on August 27. His training lasted for three weeks.

10. There is conflicting testimony concerning whether, on September 11, plaintiff met with Geoffrey Smith, a Mobil staff attorney, to discuss the Melillo situation and the effect that the litigation could have on plaintiff's operation of the station. Plaintiff testified that such a meeting did not take place at that time and he never at any time met with Smith. Defendant's representatives testified that there was such a meeting and that plaintiff was fully informed of the possible consequences of the pending litigation. Additionally, defendant claims that plaintiff was shown a draft of a letter of understanding concerning the Melillo situation. He was told, according to defendant, that he would have to sign the letter of understanding before he would be granted the franchise. As is discussed below, resolution of this conflicting testimony is not necessary. For purposes of this ruling only, the court accepts, without deciding, the accuracy of defendant's version.

11. On October 17, 1979, plaintiff and defendant entered into a franchise agreement. Included in the agreement was the letter of understanding that purports to define an event relevant to the franchise relationship that would make termination reasonable. This event was described as the "successful assertion of the Melillo Estate of its claimed right to dispose of its purported interest in the operation of this service station [or] . . . a future determination by Mobil to acknowledge the rights claimed to exist by the Melillo Estate, whether or not successfully asserted in a judicial or administrative action. . . ." Plaintiff began operating the station on October 26, 1979.

12. Mobil subsequently settled the litigation with the Melillo estate. The estate was paid $75,000 and withdrew the lawsuit. On June 15, 1981, plaintiff was notified that this settlement was an event relevant to the franchise relationship that would make termination of the franchise reasonable as purportedly agreed to in the letter of understanding. There is no evidence before the

court concerning whether there were any discussions between defendant and Melillo's estate relating to anything other than the settlement of the claims for money damages. At no time did defendant lose possession of the right to lease the premises or enter into a franchise relationship with plaintiff.

13. The income generated by the station is plaintiff's sole means of support. Denial of the requested relief would impose substantial hardship upon the plaintiff. The hardship imposed upon defendant by the granting of preliminary injunctive relief, if any, would be negligible compared to the hardship imposed upon the plaintiff by denial of the preliminary injunction.

DISCUSSION

The PMPA provides that "the following are grounds for termination or nonrenewal of a franchise relationship: ... (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable...." 15 U.S.C. § 2802(b)(2)(C). The statute lists twelve events that are "relevant to the franchise relationship." 15 U.S.C. § 2802(c). The statute does not purport to be exhaustive and it is possible that an event relevant to the franchise relationship may occur that is not specifically delineated in the statute. *See, e. g., Lanham v. Amoco Oil Co.*, 481 F.Supp. 405, 407 (D.Md. 1979).

█ The initial question is whether an agreement that defines an event as being one that is relevant to the franchise relationship is a valid agreement. Plaintiff argues that such an agreement would contravene the purposes of the PMPA. The court agrees with this contention. An examination of the legislative history of the PMPA reveals that it was enacted to protect the franchisee from arbitrary terminations.

Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the franchisor and the franchisee. This disparity results in franchise agreements which some franchisees have argued

amount to contracts of adhesion. The provisions of the contracts between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity of bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor.

Senate Report No. 95–731, 95th Cong., 2d Sess., 17, [1978] U.S.Code Cong. & Admin. News 873, 876.

The evidence in this case clearly demonstrates that plaintiff was compelled to sign the letter agreement or he would not have been granted the franchise. Regardless of when he first saw the letter agreement, he was faced with a situation where the franchisor had complete control over the agreement. It was drafted by the franchisor and presented to the franchisee without meaningful negotiation. This disparity of bargaining positions is exactly what Congress considered when enacting the PMPA. Congress felt that specific rules were necessary to protect the franchisee from arbitrary termination. "Such a set of rules would clearly define the rights and obligations of the parties to the franchise relationship in the crucial area of termination of a franchise or non-renewal of the franchise relationship." *Id.* at 19, [1978] U.S.Code Cong. & Admin.News at 877.

Defendant's argument that the parties can agree to a definition of an event relevant to the franchise relationship is without merit and cannot overcome the clear intent of Congress. Citation is made by defendant to *McFadden v. Amoco Oil Co.*, 486 F.Supp. 274 (D.S.C.1979). That case upheld the right of the parties to agree to terminate a franchise. That situation is different from the situation here. Such an agreement is expressly authorized by the PMPA. 15 U.S.C. § 2802(b)(2)(D). In that situation, the parties are not in an unequal bargaining position. If the franchisee does not want to terminate the franchise, he can simply refuse to enter into such an agreement.

Defendant also cites to *Lanham v. Amoco Oil Co., supra* and *Haynes v. Exxon Company, U.S.A.*, 512 F.Supp. 543 (E.D.Tenn. 1981). Those cases do not stand for the proposition that parties can agree to define an event relevant to the franchise relationship. The courts in those cases decided that an event relevant to the franchise had occurred. The courts focused on the events themselves and not whether the existence of an agreement controlled the circumstances. Thus those cases cannot possibly stand for the proposition that the parties can define an event relevant to the franchise relationship.

Defendant also cites to *Malone v. Crown Central Petroleum Corp.*, 474 F.Supp. 306 (D.Md.1979) for support. That case construed 15 U.S.C. § 2802(b)(2)(A), which concerns termination for failure "to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." The situation therein involved was the franchisee's failure to meet certain minimum gallonage requirements. The fact that the court in *Malone* upheld that provision of the franchise agreement is irrelevant to the issue here. The PMPA does not prevent the parties from entering into a contract. It is concerned with the termination of the franchise relationship. There is a vital distinction between the failure by a franchisee to comply with a provision in a contract and the parties agreeing that an event is one that is relevant to the franchise relationship. The statutory language concerning the former situation contemplates the existence of a contract. The latter situation contemplates the occurrence of an event outside the basic elements contained in the franchise agreement.

Resolution of this issue is, however, not dispositive of the injunctive relief question. An event relevant to the franchise relationship could have occurred regardless of whether any agreement existed. The statutory list does not purport to be exhaustive. Courts have found the occurrence of an event relevant to the franchise relationship that has not been specifically listed in the statute. *See, e. g., Lanham v. Amoco Oil Co., supra.* The legislative history clearly indicates that

> a judicial determination may be made that an event, other than one enumerated in this list, or an event similar but not identical to one enumerated in the list, constitutes an event which is relevant to the franchise relationship as a result of which termination or nonrenewal is reasonable. However, events which are not enumerated in subsection (c) must be carefully scrutinized by the courts prior to a determination that the statutory standard set forth in [15 U.S.C. § 2802(b)(2)(C)] has been satisfied.

Senate Report No. 95–731, 95th Cong., 2d Sess., 38, [1978] U.S.Code Cong. & Admin. News 896.

■ What has occurred here is that defendant entered into a settlement whereby Mobil paid $75,000 to Melillo's estate in return for which Melillo's estate terminated the litigation pending against defendant. Defendant continued to have the right to lease the station to plaintiff. The settlement of the Melillo suit is not an event that is relevant to the franchise relationship where defendant maintained control of the location. Although the twelve events enumerated in the statute have been supplemented by the courts, the cases that do so supplement involve situations where the event was of the same nature as one of the events listed in the statute. For example, in *Lanham v. Amoco Oil Co., supra*, the court held that death of the franchisee was an event relevant to the franchise relationship. In so holding, the court noted that one enumerated event in the statute is a "continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises." 15 U.S.C. § 2802(c)(3). There is nothing in 15 U.S.C. § 2802(c) resembling the event that occurred in this case. Especially significant is that at no time did defendant's settlement with the Melillo estate render it legally impossible for plaintiff to occupy the station and to operate it as

defendant's franchisee. In view of the Congressional mandate to scrutinize closely an event not listed in the statute, this court will not find the event that occurred here to be one relevant to the franchise relationship.

The court also notes that even if the parties may legally contract that an event is one that is relevant to the franchise relationship and thus makes termination reasonable, the event agreed to by the parties in this case never occurred. There are certainly issues of credibility present. Plaintiff's testimony conflicted with that of defendant's representatives. Yet even if the court were to resolve all doubts in favor of the accuracy of the testimony offered in behalf of the defendant, it would still conclude that the settlement that defendant entered into with Melillo's estate was not covered in the agreement. The letter agreement provided that plaintiff was "expressly agreeing that the successful assertion of the Melillo Estate of its claimed right to dispose of the purported interest in the operation of this service station constitutes" an event relevant to the franchise relationship pursuant to the PMPA. Furthermore, the parties also agreed that an event relevant to the franchise relationship would be "a future determination by Mobil to acknowledge the rights claimed to exist by the Melillo Estate, whether or not successfully asserted in a judicial or administrative action...." Defendant argues that the latter quotation manifested an agreement that *any type of settlement* with the Melillo estate could result in termination. The plain language of the agreement is to the contrary. If an agreement defining an event relevant to the franchise relationship were a valid one, the parties indeed could have agreed that *any* settlement would be a relevant event. That is not what the parties agreed to. The payment of $75,000 does not constitute an acknowledgment of the rights of the Melillo estate, as defined in the agreement.

If there were any ambiguity on that point, the testimony heard by the court would resolve any question, and clearly supports the court's conclusion that the agreement did not contemplate as an actionable event a simple cash payment by Mobil to the Melillo estate in return for termination of the litigation. If defendant so intended, it never communicated such intention to the plaintiff.

The court on this issue heard testimony from a multitude of witnesses. Defendant had every opportunity to advance its contention. Defendant presented six witnesses who were officials of the company, five of whom claimed to have discussed the Melillo situation with the plaintiff before the agreement was executed, and the sixth of whom testified as to the orders he issued to the other five. The testimony of the supervisor, Rucci, supports the testimony of his representatives in the discussions, Roenick, Brigati, Mason, and McNally, that at no time did they have any memorandum of specific legal or factual points to be presented to the plaintiff. Time after time, these witnesses testified that they advised the plaintiff generally of the existence and the status of the Melillo lawsuit, and warned that a loss or settlement of the suit might make it impossible for Mobil to permit the continuation of the plaintiff's franchise, once awarded. The lawsuit was never lost, but what was plaintiff told by these representatives of the defendant about the effects and nature of the Melillo settlement?

Defendant's witnesses are in agreement that staff attorney Smith, who testified, was the key representative of the defendant designated to be fully responsible for the letter agreement with the plaintiff. His importance is underlined by the testimony of Roenick, who accompanied Smith to the claimed meeting with the plaintiff at which the agreement was presented and discussed. Roenick testified that he had never before known of defendant having a staff attorney meet with a dealer candidate. (Tr. 161, 9/14/81). The talks held by Brigati, Mason, and McNally with the plaintiff were all preliminary screenings of applications to determine the successful dealer candidate, and generally their advice to plaintiff about the Melillo litigation was

based upon their understanding that the plaintiff would have to meet with staff attorney Smith to obtain the details and legal ramifications of that litigation. The testimony of Mason is typical, at Tr. 202–03 on 9/14/81. He advised each candidate as to the litigation, saying that "if we would get the wrong decision on this case, that the service station could go back to the Estate." He added that "we wanted to be sure that they were fully aware of what the situation was and we would have our region attorney, who in this case was Jeff Smith, sit down with our final candidate and explain it. . . ."

Defendant offered also the testimony of three dealer candidates, and plaintiff offered two more, and all five basically agreed with the testimony of the Mobil officials as to the preliminary and general nature of the interviews as to which Brigati, Mason, and McNally testified. The court therefore reviews in greater detail the testimony of staff attorney Geoffrey Smith concerning the meeting that he. alleges took place with the plaintiff on September 11, 1979.

Smith stated that he "covered with him [plaintiff] the possibility of settlement indicating that I know if it didn't run its full course to termination of the litigation where you had a clear winner or loser, there was a possibility that Mobil would recognize the Estate's claim and that at that point in time that would become an event which would justify his termination." Tr. 32, 9/23/81.

What did Smith intend to convey in telling plaintiff that defendant might recognize the claim of the Melillo estate? Did he mean throwing in the towel and conceding the right of the Melillo estate to dispose of the station, so that defendant would no longer be able to continue its agreement with plaintiff? If so, this was a risk that plaintiff had to assume, since the result would be the same as a court decision to that effect, one clearly contemplated by the agreement. Did Smith mean to include a situation whereby defendant would decide to terminate the suit for any number of possible reasons, but based on a payment of value to the estate so that defendant could remove any cloud on its right to continue its franchise with the plaintiff? This in essence is what occurred. Was plaintiff entering into an agreement that covered that type of Melillo settlement by defendant, one that did not mean the loss of the dealer selection right at any time by defendant? This court thinks not, and looks to the testimony of Smith as he elaborated on his general testimony just set forth as to what he said to the plaintiff. What he said to the plaintiff presumably was consistent with the instructions he was providing to the field representatives, Brigati, Mason, and McNally, as to the briefings to be given the dealer candidates. The most significant testimony the court finds on that point is Smith's testimony at Tr. 39–40, 9/23/81 when he says about these representatives: "They had to know we were in the middle of litigation on a constitutional challenge and that we didn't know what the result would be.

Q That was to protect the dealer?

A Protect the dealer. Otherwise we'd end up with two franchises in one location."

This was the issue for defendant, clearly shared with the plaintiff and with the other applicants. If the lawsuit were to be lost or if defendant threw in the towel, the Melillo estate could determine that the dealer would be out on his ear. This was a risk obvious to plaintiff and the other applicants. What was never made obvious to them or set out in the agreement letter was that defendant might decide to keep its right to maintain its dealer relationship by making a payment to the Melillo estate and then claim reimbursement of that payment from the dealer. Defendant advances that argument by making a distinction, as Smith did immediately after giving the foregoing testimony, between a right of possession to operate and a right of disposition. If that had been a distinction important in defendant's eyes, it certainly was never conveyed to the plaintiff, nor is it persuasive in any degree to this court.

The burden of clarity, if ambiguity there was, rests clearly with defendant, whose attorney drew the letter agreement and made it a mandatory portion of the franchise package for plaintiff to sign. This court, following the doctrine so-oft enunciated in contract law, construes the agreement as the plaintiff understood and signed it, and holds that the event described therein has never occurred. *See Stern v. Satra Corp.*, 539 F.2d 1305, 1309 and 1310 (2d Cir. 1976).

STANDARD FOR A PRELIMINARY INJUNCTION

■ The PMPA establishes a liberal standard for the issuance of a preliminary injunction. *See Lasko v. Consumers Petroleum of Connecticut, Inc.*, Civil No. B–81–386 (D.Conn.1981). The statute provides that:

the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2).

The first prong of the test, that the franchise has been terminated, has clearly been met. There is no dispute concerning this fact.

The second part of the test has also been met. Whether or not the reason for termination is an event relevant to the franchise relationship is at issue here. As has been demonstrated above, plaintiff has clearly raised serious questions going to the merits so as to make such questions a fair ground for litigation.

The third and last part of the standard under the PMPA makes this standard more liberal than the threshold requirement commonly applied for the issuance of injunctive relief. In place of the requirement of irreparable harm, *see Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755 (2d Cir. 1979), the statute requires only that the court balance the hardships. Denial of preliminary injunctive relief will impose a great hardship upon plaintiff. He has testified that the income derived from the station is his sole source of income. It is difficult for the court to understand how granting relief will impose any hardship on defendant. It is clear that plaintiff is operating the station profitably, both for himself and for defendant. Any hardship imposed upon the defendant is negligible compared to the hardship that would be imposed upon plaintiff were this court to deny his motion for a preliminary injunction.

CONCLUSION

■ The court concludes that an event relevant to the franchise relationship has not occurred. The agreement between plaintiff and defendant that attempts to define an event relevant to the franchise relationship is invalid as being contrary to the purposes of the PMPA. However, even if such an agreement is valid, the event agreed to has not occurred. Furthermore, even in the absence of a valid agreement, an event relevant to the franchise relationship resulting in reasonable statutory termination has not occurred.

The statutory standard governing the issuance of a preliminary injunction has been met. The motion for a preliminary injunction is therefore GRANTED pursuant to the order entered by this court on November 9, 1981.