FARM STORES, INC., Plaintiff,

v.

TEXACO, INC., Defendant.

No. 83–2153–Civ–SMA.

United States District Court,
S.D. Florida.

Dec. 29, 1983.

Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Miami, Fla., for plaintiff.

Smathers & Thompson, Miami, Fla., for defendant.

## MEMORANDUM OPINION

ARONOVITZ, District Judge.

*Containing Findings of Fact and Conclusions of Law*

THIS CAUSE was heard by the Court at a non-jury trial extending over the course of three days. Numerous witnesses testified, many exhibits were admitted into evidence, and the Court heard extensive oral argument by counsel for both parties, receiving and considering also pretrial memoranda of law, proposed findings of fact and conclusions of law as well as post-trial supplemental memoranda of law from both sides. The Court has had ample opportunity to observe the lay witnesses, the parties and their representatives, as well as an expert witness. Having fully considered all of the foregoing, the Court record, and being otherwise fully advised in the premises, the Court hereby renders this Memorandum Opinion thereon, including herein its Findings of Fact and Conclusions of Law as follows:

### I. *Nature of the Action*

1. Plaintiff, FARM STORES, INC. ("FARM STORES"), filed this action against the Defendant, TEXACO, INC. ("TEXACO"), seeking a declaratory judgment, injunctive relief and damages. The Complaint alleges that TEXACO has failed to renew a gasoline station franchise relationship existing between it and FARM STORES in violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. (the "PMPA"). FARM STORES also seeks damages contending that TEXACO is indebted to it for certain sums of money, which TEXACO has failed and refused to pay. In addition, TEXACO, by way of Counterclaim, seeks Ejectment of FARM STORES from the premises and mesne profits.

### II. *Basis of Federal Jurisdiction*

2. FARM STORES' Complaint arises from alleged violations of Sections 102 and 104 of the PMPA. The Court has jurisdiction over this action under Section 105 of the PMPA, 15 U.S.C. § 2805, under 28 U.S.C. § 1331 since this action arises under the laws of the United States and involves the requisite jurisdictional amount and under 28 U.S.C. § 1332 since this is an action between citizens of different states involving the requisite jurisdictional amount. The Court has ancillary jurisdiction over TEXACO's Counterclaim.

### III. *The Procedural Background*

3. The Plaintiff, FARM STORES, is a Florida corporation with its principal place of business in Dade County, Florida. FARM STORES is engaged in the business of managing and operating approximately 265 convenience stores and related facilities which sell grocery and dairy products throughout the State of Florida. Approximately 90 of these facilities are utilized for

the marketing of both food products and motor fuel. FARM STORES is a branded retailer/dealer in many of the locations. In others, it sells fuel under its own private label.

4. The Defendant, TEXACO, is a Delaware corporation operating as an integrated oil company. TEXACO is engaged in all aspects of the refining, production, distribution, and sale of motor fuel and other related petroleum products throughout the world, and is licensed and does business in the State of Florida. TEXACO conducts its business under trademarks consisting of the name "Texaco", and the logo known as the "Texaco Star", both of which it owns and controls.

5. In August of 1982, FARM STORES and TEXACO entered into a written contract (hereinafter the "Contract") relating to the use of marketing premises consisting of a gasoline island, a convenience store, and a car wash (hereinafter the "Facility"). The Contract provides for a term of one (1) year with automatic renewals for one (1) year terms.

6. In May of 1983, TEXACO, pursuant to the Contract, notified FARM STORES that it would not be renewing the contract relationship relating to the Facility at the end of the first year. On August 25, 1983, FARM STORES filed its Complaint and Motion for Temporary Restraining Order and Preliminary Injunction seeking to enjoin TEXACO's non-renewal of the Contract. The Complaint alleges that the relationship between the parties is governed by the PMPA and that the notice received from TEXACO does not comply with the PMPA. The Complaint further alleges that FARM STORES has incurred certain expenses which TEXACO is required to reimburse but has failed to do so.

7. On August 30, 1983, a hearing was held on FARM STORES' Motion for Entry of a Preliminary Injunction. The parties stipulated that TEXACO's notice of non-renewal was sent on or about May 26, 1983. The parties also stipulated, and the Court finds, that no notice, if required under the PMPA was, in fact served by TEXACO upon FARM STORES.

8. On August 31, 1983, this Court entered a Preliminary Injunction in this cause.* At the time the Court determined, and herein affirms, that it is necessary to read the applicable provisions of the PMPA *in pari materia*, each with the other, and as applied to the Contract between the parties.

9. TEXACO filed its Answer, Affirmative Defenses, and Counterclaim for Ejectment on September 15, 1983. Therein, TEXACO admitted, and this Court finds, that venue is proper for purposes of this action. On September 30, 1983, FARM STORES filed its Answer and Affirmative Defenses to the Counterclaim.

IV. *The Issue Presented*

10. The principal issue presented is whether the contractual relationship existing between FARM STORES and TEXACO is the type of relationship which Congress intended to be protected under the PMPA. The applicability of the PMPA to the innovative gasoline/food marketing relationship examined in this case presents an issue of first impression. The resolution of this issue must be found in a review of the PMPA itself, the PMPA's legislative history, the Contract, and the factual background of this matter.

V. *The Factual Background of the Contractual Relationship*

11. This lawsuit arises out of a dispute concerning a right to occupy a convenience store and self-service gas station located at 18255 N.W. 57th Avenue, Dade County, Florida (the "Property"), which property was acquired by TEXACO in 1962, and has been continuously owned by TEXACO since that time.

12. TEXACO constructed a retail gasoline service station on the Property prior to January 1, 1979, and leased it to an independent dealer who operated a branded

---

* The Preliminary Injunction maintained the status quo whereby FARM STORES retained possession of the Facility until the Complaint could be ruled upon after an expedited trial.

Texaco service station at the location. In 1979 the independent dealer left the Property, and TEXACO closed the location.

13. Prior to January 1, 1982, the Texaco branded station on the Property was destroyed by fire.

14. TEXACO, as owner of the Property, received numerous inquiries from parties interested in purchasing or leasing the property, including offers to lease or purchase made by FARM STORES, which FARM STORES initiated in 1979.

15. TEXACO undertook various studies concerning the prospective use of the Property which had a land market value of $400,000. TEXACO concluded that the best way to get motorists into the gas station through the year 2000 would be to have a combined operation of a self-serve gasoline outlet and a miniature convenience store on the same premises. TEXACO then began building such integrated structures, which it refers to as System 2000's. In 1982, a corporate decision was made by TEXACO to build a System 2000 on the Property. This particular System 2000 incorporates a car wash. (The "Facility"). The improvements to the Property cost TEXACO approximately $500,000.

16. Prior to and during the construction of the Facility, TEXACO considered various alternatives concerning the operation of the Facility and communicated with a number of interested parties, including FARM STORES, regarding the Facility's operation.

17. In the late Spring of 1982 TEXACO advised FARM STORES that it was negotiating a contract with the Southland Corporation, the owner of the 7–11 convenience store chain, and that the subject site would be awarded to Southland Corporation.

18. When advised of this selection, Richard E. King, the Vice President of FARM STORES, inquired whether there was something that FARM STORES could do in order to obtain this location. He was told that FARM STORES might still have a chance to get the location but only if Mr. King wrote a letter agreeing to sign the Contract "as written". Accordingly, on June 1, 1983, without any meaningful negotiation, Mr. King wrote the letter advising that he would accept the Contract as written. (Plaintiff's exhibit 13). Mr. King noted in his letter that "the document is not one we could accept, under ordinary circumstances". The Court finds that FARM STORES had tried for three years to obtain a presence at this valuable location, and Mr. King was, in essence, told "take it, or leave it" when presented with the Contract. See, *Lyons v. Mobil Oil Company*, 526 F.Supp. 961, 964 (D.Ct.1981). Interestingly, FARM STORES—not Southland Corporation—received the location.

19. TEXACO opened the Facility for sales by FARM STORES of motor fuel on behalf of TEXACO on September 1, 1982, and FARM STORES began selling groceries from the convenience store at the Facility on September 18, 1982.

20. The Contract provides in ¶ 1 that FARM STORES shall, at its own risk and expense, sell the items and services ordinarily offered at a convenience store and that FARM STORES shall receive all revenue and profits from such sales:

> Texaco hereby grants Contractor [Farm Stores] for the term and upon the terms and conditions hereinafter set forth the right to use the Facility as a convenience store and Contractor is obligated to operate a convenience store, together with the building and other improvements thereon, and together the right to use all adjoining parking areas, driveways, sidewalks, roads, alleys and means of ingress and egress to the Facility. Contractor shall, at its own risk and expense, sell those items and services which are customarily offered in its convenience store operation and shall have the sole right to all revenue and profits therefrom.

FARM STORES also retains the proceeds from the car wash and polishing operation.

21. *The Contract provides in ¶ 2 that:*
> *TERM* The term of this Contract shall commence on the Effective Date and shall continue for a period of one (1) year thereafter, and shall be auto-

matically extended for like terms unless either party terminates the Contract upon written notice to the other party ninety (90) days prior to the expiration date of the original term or any extension thereof. The Effective Date will be agreed to by the parties and evidenced by a letter.

22. FARM STORES presented undisputed testimony that it sought to negotiate a lease for a minimum of three years. There is no reason to believe that it thought it would be receiving any less under the Contract. The bald fact is, however, that the Contract provides a term of one (1) year, with automatic renewals unless terminated. The Court finds that FARM STORES had the reasonable expectation that the relationship would last longer than the initial term of one (1) year.

23. The Effective Date of the Contract was September 1, 1982.

24. Under the terms of the Contract, TEXACO agreed to pay FARM STORES $3.00 per hour for the operation of the Facility as provided under ¶ 6 of the Contract, and TEXACO agreed, pursuant to FARM STORES' request, to increase the hourly rate for the operation of the Facility to $4.90 per hour, as reflected by the revised Exhibit "C" to the Contract, which revision is dated January 3, 1983.

25. In exchange for receipt of the hourly rate from TEXACO and the right to retain the profits from the convenience store sales at the Facility, FARM STORES contracted to operate the convenience store at the Facility, to furnish an employee to receive money from customers for purchases of gasoline from self-service dispensers at the Facility and to do daily cleaning chores at the Facility such as sweeping, polishing and mowing.

26. In a sense, both TEXACO and FARM STORES serve the "motoring public". When TEXACO decided to build the System 2000's it also decided that none of these facilities should be company owned or operated, but rather should be operated by others who were knowledgeable about selling food products.

27. At the same time TEXACO was constructing the System 2000 facilities, FARM STORES was developing its own style of marketing premises that involved the use of a convenience store and gasoline island. At the locations, FARM STORES sold its own private brand of gas. In addition, FARM STORES became a branded retailer/dealer for other major oil companies with respect to the same type of marketing premises involving a gasoline island and convenience store.

28. TEXACO has two types of operations at its branded retail outlets. First, some of its retail outlets are operated by conventional retailers/dealers, who, TEXACO concedes, fall within the parameters of the PMPA. TEXACO's other retail outlets are operated by "contract operators". TEXACO contends these contract operators do not have the protections of the PMPA. TEXACO contends FARM STORES is such a non-protected contract operator.

29. The Court is, thus, faced with the question of whether the arrangement between FARM STORES and TEXACO, which TEXACO refers to as a contract operation, is protected by the PMPA. To answer that question, the Court must first look to the Contract itself.

30. The Contract, by its own terms, designates FARM STORES as an independent contractor (¶ 6). FARM STORES is given the sole right to hire and discharge the personnel that are employed to handle gasoline sales (¶ 6.1). FARM STORES pays all salaries, wages, fringe benefits, and other forms of compensation and reimbursement, as well as payroll taxes that are due as a result of work that is performed in the course of gasoline and convenience store sales (¶ 6.2). The employees of FARM STORES are required to handle the sale of gasoline in accordance with "the operating instructions" and "guidelines" established by TEXACO. FARM STORES and its employees are bound by the terms of the "Texaco Retailer Credit Card Agreement"

in connection with credit card sales of gasoline.

31. With respect to risk of loss, FARM STORES is required to maintain personal injury and property damage insurance covering the Facility (¶ 7.1[a]). In addition, FARM STORES must provide workmen's compensation insurance on all employees who work at the Facility, including those involved in gasoline sales (¶ 7.1[c]).

32. The Contract requires FARM STORES to sell TEXACO motor fuels to the motoring public at the Facility (¶ 8.1). Consistent with that obligation, the Contract requires FARM STORES to agree to hold TEXACO harmless in the event that any FARM STORES employee violates the federal law prohibiting the introduction of leaded gasoline into any motor vehicle which is labelled "unleaded gasoline only" (¶ 7.3).

33. Although the Contract provides that TEXACO retains title to gasoline which is in the underground tanks, it also provides that FARM STORES is responsible for the loss of any such fuel due to the negligence, willful act or misconduct of any FARM STORES' employee (¶ 8.2[a]). Indeed, the Contract imposes an additional duty upon FARM STORES to protect TEXACO's inventory from any loss, destruction, or theft (¶ 8.2[e]). Similarly, FARM STORES is responsible for all shortages and loss of funds, including any due to robbery, theft, or burglary unless the funds were locked in a safe or depository in the convenience store premises (¶ 11) (¶ 8.2). Further, FARM STORES is responsible for all driveaways and chargebacks for improper credit card use (¶ 8.2[d] and [f]).

34. FARM STORES does not make any payments to TEXACO that are designated as "rent". However, FARM STORES does pay for all of the utilities in connection with the operation of the Facility, including electricity and water. Under the Contract, the total amount of expenses incurred by FARM STORES that are directly attributable to gasoline sales is in excess of $2,000 per month.

35. The Contract provides:

SIGNS Texaco and Contractor [Farm Stores] shall erect at a mutually agreeable location (as on Plat Plan Exhibit B), its respective sign at its own cost. Contractor has the right to operate the Facility under any trade name of its choosing.

(¶ 11).

FARM STORES did, in fact, operate under its trade name "Farm Stores" and has signs at the Facility so reflecting. Likewise, there are TEXACO signs at the Facility.

36. TEXACO sets the price of all gasoline sold at the Facility and maintains approximately $40,000 worth of gasoline inventory at the Facility (¶ 8.1).

37. Pursuant to Exhibit "C" to the Contract, TEXACO has the obligation to pay for all gasoline licenses and permits for the Facility while FARM STORES must pay for convenience store licenses and other permits at the Facility.

38. TEXACO owns, controls, and maintains the underground tanks, the pumps, and all other equipment and improvements used in the storage, handling and dispensing of gasoline at the Facility (¶¶ 3 and 4). TEXACO also delivers gasoline directly into the tanks which it owns and controls at the Facility.

VI. *Statutory Framework*

39. Before proceeding forward, it is important to note several points. First, the relationship between the parties established by the Contract is unlike any other relationship considered in the cases reported dealing with the application, *vel non*, of the PMPA. Second, TEXACO contends that the Court must look only to the literal words and definitions set forth in the PMPA in deciding this case and cannot go farther. However, even the cases relied upon by TEXACO demonstrate that a purely literalistic inquiry is incomplete. *Checkrite Petroleum, Inc., v. Amoco Oil Company*, 678 F.2d 5, 8 (2d Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982); *Johnson v. Mobil Oil Corporation*, 553 F.Supp. 195, 199 (S.D.N.Y.1982). In-

deed, the Court agrees with the statement in *Munno v. Amoco Oil Company,* 488 F.Supp. 1114, 1118 (D.Ct.1980), that:

> Where a statute is to be construed, the object of the court is to ascertain the congressional intent and to give effect to the legislative will. *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 607–08, 99 S.Ct. 1905, 1910–1911, 60 L.Ed.2d 508 (1975); *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Proper construction requires that the court consider the terms of the statute in light of the mischief the statute was intended to remedy. *Liberation News Service v. Eastland,* 426 F.2d 1379, 1383 (2d Cir.1970).

Third, if the PMPA does govern this controversy, then TEXACO has violated the PMPA because the non-renewal notice did not comply with the notice requirements of Section 2804.

40. The PMPA applies only to the relationship between a refiner and a distributor or retailer of motor fuels under a brand name and makes such a relationship a franchise. 15 U.S.C. § 2801.

41. The PMPA prohibits the termination or non-renewal of a franchise unless the termination or non-renewal is based on one of the reasons set forth in Section 2802 and complies with the procedural requirements for notice set forth in Section 2804.

42. The PMPA provides, *inter alia:*

The term "franchise" includes—

(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy *leased* marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—

(I) under a trademark owned or controlled by a refiner[.]

15 U.S.C. § 2801(1)(B)(i) and (ii). (Emphasis added).

43. The PMPA defines a "franchisee" as a "retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel". 15 U.S.C. § 2801(4).

44. The PMPA provides further that:

(6) The term "distributor" means any person, including any affiliate of such person, who—

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

15 U.S.C. § 2801(6).

45. The PMPA defines "retailer" as "any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7).

46. Since TEXACO acknowledges that it is a refiner under the PMPA the question of statutory interpretation before this Court is narrowed to whether FARM STORES is a franchisee under the PMPA. Consideration of the legislative history is important to a proper analysis of the PMPA's applicability to this "Contract."

### VII. *Legislative History*

47. As with most legislation, the PMPA was enacted for the purpose of curbing a prevailing evil. In *Brach v. Amoco Oil,* 677 F.2d 1213 (7th Cir.1982), the court described the goal of Congress:

> Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross

disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or non-renewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.

*Id.* at 1216.

48. Senate Report No. 95–731 discusses Congress' concerns in greater detail:

The franchise relationship in the petroleum industry is unusual, in fact perhaps unique, in that the franchisor commonly not only grants a trademark license but often controls, and leases to the franchisee, the real estate premises used by the franchisee. In addition the franchisor almost always is the primary, even exclusive, supplier of the franchisee's principal sale item: motor fuel. This relationship is, therefore, often complex and characterized by at times competing interests.

      \*     \*     \*     \*     \*     \*

Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the franchisor and the franchisee. This disparity results in franchise agreements which some franchisees have argued amount to contracts of adhesion. The provisions of the contracts between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity in bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor.

It is important to note that while the relationship of the parties to a motor fuel franchise agreement is basically contractual in nature, normal remedies for violations of the contractual provisions are often eschewed by the franchisor. The disparity of bargaining power which disadvantages the franchisee in negotiations leading to the execution of the franchise agreement manifests itself in the contractually provided remedies for con-

tract violations or changes in circumstances. Commonly the franchisor is able to capitalize on his disparity in bargaining power to obtain greater flexibility with respect to his rights to terminate the contractual relationship. As a result, termination of franchise agreements during the term as a remedy for contract violations has been repeatedly utilized.

      \*     \*     \*     \*     \*     \*

It is also important to note that often the reasonable expectations of the parties to a motor fuel franchise are that the relationship will be a continuing one. This expectation by the franchisee, in particular, is often the result of, and fostered by, statements and actions of the franchisor. As a result, non-renewal of a motor fuel franchise relationship at the expiration of its term can be almost as punitive as termination of the franchise during its term. The reasonable expectations of the franchisee, rather than any definitive contract rights, are destroyed.

S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, 17–19, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 875–77, (hereinafter referred to as "Senate Report").

49. During the course of prior communications FARM STORES sought a three (3) year lease and negotiated for such a term. Although FARM STORES executed a one (1) year lease it reasonably anticipated occupying the Facility longer either by extensions or by operation of law since TEXACO was aware of FARM STORES' investment and plans for the location. TEXACO signed a Contract to last one (1) year unless of course it was extended by the parties or by operation of law.

VIII. *Introduction to Conclusions of Law*

50. FARM STORES contends that it could be classified as either a retailer or a distributor, under the literal definitions of those terms as set forth supra. Moreover, in utilizing the "broad analysis" suggested in *Johnson, supra,* FARM STORES vigorously contends it is possessed with that

status which Congress intended to protect. In *Johnson*, the court stated that in the broader analysis approach:

[T]he dispositive question under an analysis broader than a literal reading of the statutory language is whether, on all the facts and circumstances, the Plaintiff is an employee or an independent businessman.

553 F.Supp. at 199.

Reasoning by analogy, certain cases brought in the antitrust area help to resolve the question posed by *Johnson*. Accordingly, the following discussion will concentrate on (1) a broader analysis, (2) whether FARM STORES is a distributor and (3) whether FARM STORES is a retailer.

### A. The Broader Analysis

■ 51. In the antitrust context, an agreement between a seller and its buyer fixing the price at which the buyer may resell the product is a per se violation of Section One of the Sherman Act. *Albrecht v. Herald Company*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1961); *Hardwick v. Nu-Way Oil Company, Inc.*, 589 F.2d 806, 808 (5th Cir.1979). By the same token, an agreement to fix prices with yourself or with your employee is not a violation. The major oil companies once sought to avoid the constraints of the Sherman Act by consigning gasoline inventory to their contract operators of gas stations, with a price-fixing provision in the consignment agreement. The use of the consignment device to avoid antitrust liability was decimated by the Court in *Simpson v. Union Oil Company*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

52. In *Simpson*, the plaintiff was a lessee of a retail outlet of Union Oil. He was required to sign a consignment agreement, under which title to the gasoline remained with Union Oil, and Union Oil set the retail price of the gasoline. Simpson was required to carry personal liability and property damage insurance because of the consigned gasoline, and he was responsible for all losses of the gasoline, except for acts of God as specified in the agreement. When Simpson sold gasoline below the fixed price, Union refused to renew his lease and terminated the consignment agreement.

53. As the *Johnson* court noted:

Despite the fact that [Simpson] did not set the price and did not technically "purchase" the motor fuel for resale to the public, the Court held that he had enough other indicia of an independent dealer and retail businessman to have standing to bring a price-fixing claim under the Sherman Act.

553 F.Supp. at 198.

54. There are many other cases involving gasoline stations in the antitrust context. The court in *Johnson* noted:

Despite the fact that these cases predate the PMPA, they cannot be simply brushed aside as inapplicable, as Mobil suggests. The argument can be made that Congress would not have intended to exclude from the protection of the PMPA one who received gasoline on consignment and who was considered an independent dealer under *Simpson* and its progeny for purposes of bringing a price-fixing claim with respect to the sale of motor fuel for resale to the public. Moreover, it is far from clear that Congress meant to exclude all informal consignment relationships from the protections of the PMPA.

But what does seem clear from the legislative history is that in enacting the PMPA, *Congress intended to protect motor fuel marketers and dealers who have enough of the indicia of entrepreneurial responsibility and risk to be considered independent dealers and businessmen.* At the same time, the statutory language and congressional debates also make clear that persons who act merely as employees are not entitled to the protections of the Act.

553 F.Supp. at 198–99. (Emphasis added).

■ 55. The Court agrees with FARM STORES that it is an independent dealer under *Simpson* and its progeny. Moreover, FARM STORES meets the *Johnson*

test in that it is possessed of enough of the indicia of entrepreneurial responsibility and risk to be considered an independent dealer and businessman.

56. Perhaps the most important indicia of being independent is the presence of economic risk. Before signing the Contract, FARM STORES knew that the first year's operations would be unprofitable. The financial records of FARM STORES have proven that out. Since FARM STORES bears almost all of the expenses of the operation of the Facility, it takes on substantial economic risk. In contrast, the plaintiffs in *Johnson* and *Checkrite* did not bear any economic risk. They purchased no inventory, did not pay any employees, and were not responsible for the loss of any gasoline.

57. In *Simpson* the Court placed particular emphasis on the fact that Simpson's economic return was affected by the rise and fall in the market price being charged at the pumps. The Court noted that, except for the ability to set prices, Simpson was truly an independent businessman.

58. As required by the Contract, FARM STORES operates the convenience store. Operation of the convenience store enhances gas sales. Obversely, gasoline sales enhance the food sales of the convenience store. There was evidence adduced that when the gasoline island was shut down the food sales of the convenience store dropped dramatically. Likewise, if the price of gasoline at the Facility was uncompetitive, the profits realized from the convenience store would drop commensurately. Alternatively, if the price of gasoline at the Facility were extremely competitive, the sales in the convenience store would rise. Thus, FARM STORES' profits are substantially tied to the price of motor fuel at the Facility.

59. In *Johnson*, the personnel working at the station were employees of Mobil Oil. In fact, Mobil issued all salary checks, withheld all federal, state, and local taxes and social security. Further Mobil paid the workmen's compensation premiums. FARM STORES, on the other hand, hires and pays all the personnel that are associated with the sale of gasoline. FARM STORES issues the salary checks, withholds federal income taxes (there are no state or local income taxes in the subject jurisdictions), pays FICA taxes, provides employee benefit plans, and pays the workmen's compensation premiums. FARM STORES also carries personal liability and property damage insurance as required by the Contract (¶ 7.1[a]).

60. In *Simpson*, the plaintiff was responsible for the loss of gasoline that was in his possession, save for specified acts of God. FARM STORES is required to use due care to protect TEXACO inventory from loss, destruction and theft.

61. In *Simpson*, the Court noted that the plaintiff "is compensated by a minimum commission and pays all the cost of the operation in the familiar manner." 377 U.S. at 15, 84 S.Ct. at 1053. The minimum compensation received by Simpson did not affect the Court's finding that he was an independent businessman. In this instance, just like *Simpson*, FARM STORES receives a minimum compensation. However, it pays almost all of the costs of the operation. Moreover, the direct compensation received from TEXACO hardly covers FARM STORES' actual costs connection with the sale of motor fuel.

62. In *Johnson*, the plaintiff was not responsible for cash shortages, product variation, and driveaways. In this case, FARM STORES bears the total responsibility for such losses. In addition, FARM STORES bears the responsibility for credit card chargebacks.

63. In *Johnson* and *Checkrite*, the plaintiffs did not lease the marketing premises. FARM STORES, however, does lease the Facility. The Contract even contains a Covenant of Quiet Enjoyment (¶ 13).

64. The court in *Johnson* focused the issue by asking whether the plaintiff was merely an employee or an independent businessman. If the plaintiff was an independent businessman the court would have held that he was a franchisee protected

under the PMPA. FARM STORES does not fit neatly into either the employee or independent businessman category. The Contract must, however, be construed against the drafter. Further, FARM STORES possesses enough indicia of entrepreneurial responsibility and risk to qualify for the protections provided by the PMPA. Accordingly, the following are findings of fact:

a. FARM STORES is an independent business entity under the Contract, not an employee; and

b. FARM STORES leases the Facility from TEXACO.

65. At trial the Court had the benefit of FARM STORES' expert witness, Jack W. Houston. Mr. Houston is the Executive Director of the Georgia Association of Petroleum Retailers, a position he has held for the past 21 years. He has also held numerous other trade association positions and authored several publications in the petroleum marketing field. Mr. Houston participated in the passage of the PMPA. At trial it was his opinion that the relationship between FARM STORES and TEXACO was protected as a franchise under the PMPA. The Court finds Mr. Houston's testimony credible and believable and acceptable as an expert opinion.

66. Even if a marketer does not technically purchase motor fuel for resale to the public, it would nonetheless be considered a franchisee if it is possessed with enough indicia of entrepreneurial responsibility. On this basis, therefore, it is clear that under the broader analysis, FARM STORES is a franchisee and is entitled to the protection of the PMPA.

### B. FARM STORES is a Distributor

67. Under the PMPA, a distributor is defined as one who:

receives motor fuel on consignment for ... distribution to his own motor fuel accounts or to the accounts of his supplier....

15 U.S.C. § 2801(6)(B).

Under the Contract it is clear that FARM STORES could be considered a consignee.

It receives motor fuel and resells or distributes it to its customers and the customers of TEXACO. In fact, the Contract acknowledges that gasolines are to be "delivered" by TEXACO to FARM STORES for that purpose. Under Florida law, the relationship between the parties with respect to motor fuel is a consignment. See *Edwards v. Baldwin Piano Co.*, 79 Fla. 143, 83 So. 915, 918 (1920) (a consignment is created when something is deposited with another to be sold, disposed of or called for).

68. The legislative history provides guidance on the question of who is a distributor under the PMPA:

The term "distributor" is defined broadly to include both marketers who purchase motor fuel for distribution and those who receive motor fuel on consignment for distribution to their own motor fuel accounts or to those of their supplier.

It is the intention of the committee to include consignees under the definition of "distributor" without regard to whether the accounts they serve are those of the supplier or those of the consignee. However, the committee also intends to exclude from the definition a consignee who is only an employee of the supplier or who merely provides transportation service for the supplier.

The definition requires resolution of two questions of fact before it may be determined whether a particular consignee is a "distributor" for purposes of this title.

First, is the consignee in fact only an employee of the supplier or is he an independent businessman? Considerations which may be useful in determining the independent status of the consignee are the following:

(1) whether the supplier assumes obligations for withholding of income taxes, payment of FICA taxes and payment of unemployment compensation taxes;

(2) whether the supplier exercises general direction and control commonly reserved to an employer or a principal;

(3) whether the consignee assumes the obligations for withholding of income

taxes and payment of FICA taxes and unemployment compensation taxes; and (4) whether the consignee determines the general methods of operation of his business, owns the appropriate facilities and equipment for the conduct of the business, e.g., bulk plant and delivery trucks, exercises responsibility for the internal financial management and administration of his business, and assumes the responsibility to third parties, including those to whom he distributes motor fuel, for expenses and liabilities arising from the operation of his business.

The second factual question that must be considered in determining whether a consignee is a distributor under Title I is whether the consignee, although an independent businessman, is merely providing transportation services to the supplier as would a common carrier and is not performing any other services that are a part of the distribution function.

Senate Report at 30–31, U.S.Code Cong. & Admin.News, pp. 888–889.

■ 69. Under the test set forth above, FARM STORES is a distributor for purposes of the PMPA. First, it is FARM STORES which assumes obligations for withholding of income taxes and payment of FICA and unemployment compensation taxes. Second FARM STORES operates the Facility, and TEXACO exercises none of the powers "commonly reserved to an employer". Third, FARM STORES exercises responsibility to third parties for expenses and liabilities arising from the operation of the Facility. Finally, FARM STORES is not supplying transportation services.

### C. FARM STORES is a Retailer

70. The PMPA defines a retailer as one "who purchases motor fuel for sale to the general public". 15 U.S.C. § 2801(7). In reviewing the Contract, the initial impression would be that FARM STORES does not purchase motor fuel. However, upon closer inspection, and a review of TEXACO's internal accounting procedures, FARM STORES could be considered an actual or constructive purchaser of gasoline from TEXACO.

71. The Contract provides:

All funds, received by Contractor from the sale of motor fuel shall be and remain the property of Texaco. Contractor shall safeguard, preserve and remit all such funds to Texaco in accordance with the terms of the Contract.

(¶ 8.1).

72. The form Contract would suggest that FARM STORES is required to deliver to TEXACO the actual bills and coins that are received for the sale of gasoline. The reality is as follows: (1) FARM STORES employs an armored car company to pick up the cash receipts from both the gasoline sales and food sales (such receipts coming from a single cash register); (2) all of the funds are deposited in a single FARM STORES bank account; (3) FARM STORES sends a check to TEXACO on a daily basis for the amount of gas sales (less credit card receipts). Thus, the substance of the transaction is that FARM STORES purchases the gasoline but does not pay for it or remit the funds paid by the purchaser until the product has been resold to the motorist. Relevant to the finding that FARM STORES purchases the gasoline is the fact that every discrepancy in gasoline or funds during the initial term of the Contract was paid for by FARM STORES.

■ 73. Consistent with this approach, attachments to the Contract refer to FARM STORES as a retailer (Exhibit "G" —Texaco Retailer Credit Card Agreement and Exhibit "F"—Guidelines for handling of Unleaded Gasoline-Retailers and Consumer Accounts). Thus, for all intents and purposes, FARM STORES is a retailer.

74. To suggest, as TEXACO does, that FARM STORES is not a retailer because it is TEXACO which owns the land, equipment, tanks and pumps is not persuasive. Even in the traditional (non-convenience store) relationship, the refiner owns the land, equipment, tanks and pumps. Further, the fact that TEXACO holds title to

the gasoline is not persuasive. While TEXACO holds title, FARM STORES bears the risk of loss of the gasoline. Therefore, who owns the real property and has title to the gasoline is not significant in determining whether or not FARM STORES is a retailer under the PMPA.

75. Even from an internal accounting point of view, TEXACO treats FARM STORES like a retailer. TEXACO assigns an account number to the FARM STORES operation. The checks received from FARM STORES are credited to that account. Whenever a delivery of fuel is made to the Facility, the account is immediately debited in an amount equal to the tankwagon price (the same price all dealers/retailers pay for TEXACO gasoline delivered directly from TEXACO). Since the retail price of the gasoline is in excess of the tankwagon price, credits to the account will exceed debits. This excess of credits over debits could be considered rent.

## IX. Conclusions of Law

76. The Contract authorizes FARM STORES to occupy leased marketing premises, which premises are used in connection with the sale, consignment, and distribution of motor fuel under trademarks that are owned by TEXACO. The Contract clearly pertains to "the supply of motor fuel which is sold, consigned or distributed under a trademark owned or controlled by a refiner." 15 U.S.C. § 2801(1)(B)(ii).

■ 77. The Contract is actually a hybrid agreement. Although TEXACO terms it a labor contract, it is actually a lease, a contract for labor and a consignment. Moreover, the Contract is TEXACO's attempt to create a relationship that does not fall within the literal terms of the PMPA. Indeed, the Contract represents TEXACO's efforts to create a relationship which would be wedged between the categories explicitly protected by Congress. Since TEXACO drafted this form contract it must be construed against TEXACO. Furthermore, contracts drafted by a member of a semi-regulated industry, such as the oil industry, should be narrowly construed to effectuate the purposes of law, especially in light of the obvious effort to defeat Congress' intention of protecting independent marketers of gasoline. Accordingly, the following are conclusions of law:

a. TEXACO is a franchisor;

b. FARM STORES is either an actual or constructive distributor and therefore a franchisee;

c. FARM STORES is either an actual or constructive retailer and therefore a franchisee; and

d. the contractual relationship between FARM STORES and TEXACO is actually a franchise under the PMPA or, alternatively, is a constructive franchise which Congress intended to protect by enacting the PMPA.

## X. TEXACO's Counterclaim

78. Pursuant to the above conclusions of law, TEXACO's Counterclaim for Ejectment is hereby DENIED.

## XI. FARM STORES' Claim for Damages

■ 79. FARM STORES' claim for damages is two-fold. First, FARM STORES claims damages arising from the shutdown of the Facility due to TEXACO's repaving of the premises. Under the Contract TEXACO had the duty to maintain the premises. No evidence was adduced at trial to show that TEXACO's repaving was done for any purpose other than maintaining the premises pursuant to its contractual obligations. Second, FARM STORES claims damages for its payments for lost gasoline. No evidence was adduced at trial to show that the loss of gasoline was due to inaccurate calibration of the gasoline pumps. The loss could have occurred from other causes for which FARM STORES would have been responsible. Therefore, since FARM STORES' has failed to carry its burden of proof to establish such damages, the cause thereof, and the right to receive such, the claim for damages is DENIED.

80. This Court will simultaneously herewith enter its FINAL JUDGMENT finding for FARM STORES and against TEXACO

under which FARM STORES shall retain possession of the Facility pursuant to law, for an extended term of one (1) year commencing September 1, 1983, or until terminated in accordance with law, but shall not recover damages and whereby FARM STORES shall recover the costs of this action from TEXACO as taxed by the Clerk.

### FINAL JUDGMENT

THIS COURT, under even date herewith, has entered herein its Memorandum Opinion containing Findings of Fact and Conclusions of Law. Pursuant thereto, and in accordance therewith, and for the reasons therein stated, it is

ORDERED AND ADJUDGED as follows:

1. The Court hereby finds for the Plaintiff, FARM STORES, INC. ("FARM STORES"), and against the Defendant, TEXACO, INC. ("TEXACO"), on FARM STORES' Complaint for declaratory and injunctive relief. Accordingly, the Court hereby DECLARES that the contractual relationship between the parties is protected by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. (the "PMPA"). FARM STORES shall remain in possession of the Facility as defined in the Contract between the parties, unless and until said Contract is terminated or not renewed in accordance with the PMPA.

2. Pursuant to the above finding the Court hereby finds for FARM STORES, and against TEXACO, on TEXACO's Counterclaim for ejectment.

3. The Court hereby finds for TEXACO, and against FARM STORES, on FARM STORES Complaint for damages. Therefore, FARM STORES shall take nothing on its Complaint for damages and TEXACO shall go hence without day.

4. FARM STORES shall recover the costs of this action from TEXACO by filing a Bill of Costs with the Clerk of the Court to be taxed by the Clerk in accordance with law.