Ronald E. MALONE

v.

**CROWN CENTRAL PETROLEUM CORPORATION.**

Civ. No. Y–79–250.

United States District Court, D. Maryland.

July 19, 1979.

Jeffrey P. Hanes, Baltimore, Md., for plaintiff.

Morton A. Sacks and Thomas L. Crowe, Baltimore, Md., for defendant.

JOSEPH H. YOUNG, District Judge.

On or about February 2, 1979, plaintiff Malone filed a complaint seeking declaratory and injunctive relief which would effectively enjoin defendant Crown Central Petroleum Corp. (hereinafter referred to as "Crown") from terminating plaintiff's Crown service station dealership located at 1920 Orleans Street in East Baltimore. Malone has operated his Crown dealership since August 19, 1974. Crown had invested some $262,000 in land acquisition and improvements in order to prepare the station for its opening, and plaintiff expended capital for his initial inventory of gasoline and motor oil, a $2,500 security deposit, and certain miscellaneous expenses such as attendants' uniforms and station supplies.

As part of its franchise agreement with plaintiff, Crown had included in its Branded Service Station Lease and Dealer Agreement a contractual requirement specifying that plaintiff had to sell certain minimum monthly volumes of Crown motor fuels. This so-called "minimum gallonage requirement" was intended to implement Crown's unique and aggressive petroleum marketing strategy geared towards a supermarket retailing of gasoline through multi-pump stations facilitating low-cost, high-volume marketing. As the key mechanism in Crown's high-volume retailing strategy, the minimum gallonage requirement permitted Crown to adjust a retailer's monthly sales obligations upwards or downwards in light of changing sales trends. Upward adjustments would occur automatically whenever a dealer's sales "have exceeded the then applicable minimum quantity of motor fuel for a period of six (6) consecutive months," and the new requirement would be "equal to the lowest quantity sold during any of the six (6) applicable months." Paragraph 6 of the Agreement dated September 1, 1976. Downward adjustments would also be automatic, but only in the event that Crown failed to exercise its absolute right of termination prior to the end of three consecutive months of below minimum sales. The relevant portions of plaintiff's final Lease with Crown read as follows:

8. GALLONAGE REQUIREMENTS: Dealer shall use Dealer's best efforts to sell at retail the maximum possible quantity of motor fuel and, subject to the provisions hereinafter set forth with respect to the month of February, Dealer agrees in any event to sell in addition to all other sales not less than 204,300 gallons of motor fuel at retail during each month.

In the event Dealer has failed to sell the above minimum quantity of motor fuel during any month, *for reason other than those beyond reasonable control of Dealer as provided in paragraph 10,* Crown may in its absolute discretion, immediately terminate this Agreement without further demand, upon giving Dealer written notice of such termination which notice shall not be less than is required by applicable state law, if any. If Crown does not exercise such right of termination and Dealer's failure to sell said minimum quantity shall continue for three (3) consecutive months without termination by Crown, then the minimum quantity of motor fuel required to be sold hereunder shall be automatically reduced to an amount, *per month,* equal to the lowest quantity sold during any of the three (3) applicable months.

The Lease also contained certain "force majeure" provisions whereby a dealer could request reduction of his minimum gallonage requirement when conditions beyond his control frustrated his contractual obliga-

tions. The relevant "force majeure" provisions, taken from paragraph ten of the Lease, read as follows:

> Upon receipt of such request, Crown shall promptly consider the same and give the Dealer written notice of its decision as to whether or not the condition specified in such request is beyond the reasonable control of the Dealer and has interrupted or hindered the operation of the Station. In the event that Crown shall decide that the operation of the Station has been hindered or interrupted by a condition beyond the reasonable control of the Dealer, then Crown shall concurrently notify the Dealer as to the minimum gallonage which shall apply during the period of such hindrance or interruption and which may be more or less than the revised minimum gallonage requested by the Dealer.

By letter dated December 14, 1978, Crown Group Vice-President Jesse D. Winzenried notified plaintiff that because he failed to meet his minimum gallonage requirement of 204,300 gallons for November his Lease and Dealer Agreement would be terminated as of March 29, 1979. Plaintiff admits that in November, 1978, as well as on other occasions, he failed to meet the minimum gallonage requirements of his contract. He insists, however, that there are three grounds upon which Crown should excuse his contract violations and upon which this Court should enjoin his termination by Crown. First, the minimum gallonage requirements in his two 1978 dealership contracts were unconscionable under Maryland's Uniform Commercial Code Section 2–303. Second, his failure to sell the contract minimum was due to "reasons beyond his reasonable control." Third, termination of his dealership would violate the Petroleum Marketing Practices Act of 1978 ("PMPA"), 15 U.S.C. § 2801 et seq., because he has fully complied with all reasonable, conscionable, and material provisions of the Crown franchise agreement. Section 102(b)(2)(A) of the PMPA authorizes franchise terminations whenever a franchisee fails "to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A).

■ The issue of unconscionability can be easily resolved. There was no evidence that the contract was due to any coercion or that undue pressure was brought to bear against Malone. At trial, plaintiff testified that in his experience and in the experience of Bill McHenry, another Crown franchisee, the Branded Lease was nonnegotiable as to the minimum gallonage requirement and was presented to Crown retailers on an essentially "take it or leave it" basis. Plaintiff accepted the Lease as offered, and having done this, he cannot claim that he lacked a meaningful choice. He had been an Amoco dealer from 1967 to 1974 and was no novice in petroleum retailing. The terms of Crown's Lease are not extreme and are generally in accordance with accepted community business practices. *Williams v. Walker-Thomas Furniture Co.,* 121 U.S. App.D.C. 315, 350 F.2d 445, 449 (1965). *See also Bergmann v. Crown Central Petroleum Corp.,* Civil No. 77–C–1001 (S.D.N.Y.1977); *Gordon v. Crown Central Petroleum Corp.,* 423 F.Supp. 58 (N.D.Ga.1976), *aff'd,* 564 F.2d 413 (5th Cir. 1977). An extensive discussion of unconscionability supporting these conclusions may be found in Chapter Four of J. White & R. Summers, Uniform Commercial Code 112–33 (1972).

The difficult issues in this case, however, are the remaining two grounds upon which plaintiff seeks to excuse his contract violations, for resolution of these points requires the Court to make a factual finding as to the reasonableness of certain business decisions made by plaintiff and by Crown. Malone claims that he failed to meet the minimum gallonage requirement due to reasons beyond his control, and because of this, termination under the PMPA was unlawful. He specifically points to several factors which he claims were beyond his reasonable control: that conversion of four gasoline stations within his general marketing area to high volume, self-service outlets caused the primary decrease in his sales

volume, and that conversion of these stations to a new self-service method of retailing which created substantial savings in terms of overhead had an effect similar to a change in traffic pattern or an increase in the number of competing stations which, in turn, reduced Malone's overall sales.

Crown, on the other hand, contends that Malone's failure to satisfy the minimum gallonage requirement was the result of factors entirely within his control in that while he posted a competitive price as to leaded regular gasoline (constituting some 38% of his sales), he failed to price competitively his unleaded and premium gasoline. Had he been willing to lower his unleaded and premium prices by one or two cents a gallon, Crown claims that plaintiff's sales volume would have increased sufficiently to allow him to meet his contract obligations. The minimum gallonage requirement was reasonable in every respect, and Crown notes in addition that prior to terminating Malone, it gave him fair warning and an opportunity to correct the situation. When he failed to do so, defendant was permitted to exercise its discretionary termination power in accordance with sections 102(b)(2)(A) and (B) of the PMPA.

Sections 102(b)(2)(A) and (B) read as follows:

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

Two issues are thus before the Court for determination: (1) whether the minimum gallonage requirement was "reasonable and of material significance to the franchise relationship," and (2) whether the plaintiff, as franchisee, failed to exercise "good faith efforts" in carrying out the provisions of the franchise.

Before commenting upon the evidence as presented at trial, it is instructive to consider the legislative history behind the PMPA. The Act went into effect on June 19, 1978 and was primarily concerned with rectifying any imbalance of power by which franchisors could improperly dominate their franchisees. Although there is very little case law to interpret the scope of the Act, one early case recognized that it was "designed to equalize the relative bargaining strengths of oil company franchisors and individual franchisees." *Frisard v. Texaco, Inc.,* 460 F.Supp. 1094, 1097 (E.D.La.1978). This concern was also reflected in the legislative history which stated:

The franchise relationship in the petroleum industry is unusual, in fact perhaps unique, in that the franchisor commonly not only grants a trademark license but often controls, and leases to the franchisee, the real estate premises used by the franchisee. In addition the franchisor almost always is the primary, even exclusive, supplier of the franchisee's principal sale item: motor fuel. This relationship is, therefore, often complex and characterized by at times competing interests.

The natural tensions which are created by this relationship have led to numerous complaints by franchisees of unfair terminations or non-renewals of their franchises by franchisors for arbitrary and even discriminatory reasons. Numerous allegations have been made before congressional committees investigating petroleum marketing problems that terminations and non-renewals, or threats of termination or non-renewal, have been used by franchisors to compel franchisees to comply with marketing policies of the franchisor.

Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the franchisor and the franchisee. This disparity results in franchise agreements which some franchisees have argued amount to contracts of adhesion. The provisions of the contracts between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity of bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor.

[1978] U.S.Code Cong. & Admin.News, pp. 873, 875–76. The legislative history further reflected a difference between the marketing aims of integrated versus nonintegrated refiners:

It is clear that there will be increasing competition among refiners, distributors and retailers for the revenue available from the sale of the gasoline and diesel fuel produced in domestic refineries or imported from abroad. Historically, integrated refiners have generally not required the "downstream" sectors of their business to produce significant profits.

*Id.* at 880. The history noted that this characteristic could change with fossil fuels becoming increasingly scarce such that marketing practices would become oriented towards generating higher returns: "These policies will increase pressure to make petroleum marketing in general, and motor fuel marketing in particular, yield far more competitive returns than they have in the past." *Id.* Consequently, one can better understand why Crown would be so concerned with high volume and would rely heavily on a minimum gallonage requirement to implement its marketing policies.

In recent years, Crown changed its marketing strategy from the conventional one or two bay full-service station to the multi-pump "gas and go" facilities now in use. As an independent, small refiner, Crown decided that, to compete with the "major" oil companies, it had to adopt a highly competitive marketing strategy by which its franchisees could undersell the major companies and thus generate high volume sales. What Crown sacrificed in price it hoped to make up in volume. To accomplish this goal, Crown charged a tank wagon or wholesale gasoline price substantially below that charged by the major oil companies. As a result, Crown retailers were able to undersell company-operated service stations.

The minimum gallonage requirement was both an integral and a reasonable part of Crown's marketing strategy. While plaintiff has hinted that the minimum gallonage requirement might be a means of achieving the sort of resale price maintenance and coercive behavior prohibited in *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), and *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), there has been no evidence that the requirement had a purpose other than implementation of Crown's legitimate marketing concerns of maximizing the volume of gas which it sold. Crown had a definite financial interest in generating high volume sales which also had the incidental effect of *lowering* gasoline prices to consumers. As owner, developer, and investor in its retail outlets, Crown had a distinct interest in the whole network of its service stations. As defense counsel pointed out, when Crown saw that its contract was being violated, it felt that it had an obligation to take the additional step of suggesting a means whereby the situation could be remedied. When Malone began to

miss the minimum gallonage requirement, Crown could have terminated his franchise without having taken any additional steps. Surely having merely *suggested* that one way to cure his dilemma was to lower prices on unleaded and premium products cannot convert Crown's legal right to termination into an illegally motivated action.

Crown has previously been involved in litigation challenging its right to terminate franchise agreements when its retailers have attempted to void contractual obligations to operate the station on a 24-hour basis and to maintain particular lighting and pump island arrangements. *See Gordon v. Crown Central Petroleum Corp.,* 423 F.Supp. 58 (N.D.Ga.1976), *aff'd,* 564 F.2d 413 (5th Cir. 1977); *Raindance, Inc. v. Crown Central Petroleum Corp.,* Docket No. C–32–79–76 (N.J.Super. 6/6/77); *Crown Central Petroleum Corp. v. Agin,* Docket No. C–2454–74 (N.J.Super. 5/25/75). With respect to the 24-hour requirement, the *Gordon* court stated:

> [This] Court is unable to agree that the 24-hour requirement constitutes an anti-competitive practice. . . . While the practice challenged here may admittedly place some strain on some individual franchises, the Court cannot find that overall competition is restricted. A violation of the Sherman Act cannot be shown by reference to hardship to an individual dealer. The regulation in question serves the public convenience and provides a competitive stimulus; it is not illegal under the antitrust laws.

423 F.Supp. at 61. Accordingly, the Court finds the minimum gallonage requirement is a reasonable and necessary part of Crown's marketing strategy.

To show whether plaintiff exercised "good faith" efforts to comply with the franchise provisions, counsel presented expert testimony on the issue of whether a one or two cent price reduction would have generated additional sales so that plaintiff could have wiped out his sales deficiencies. As could be expected, both experts presented conflicting accounts as to the relative impact, and neither expert could be specific as to the relative demand elasticities underlying their assessments. As such, the Court has no sound economic data upon which to make a reasoned conclusion on this point.

What is especially troublesome to the Court, however, is plaintiff's failure to do two things. First, although he contends that he *knew* the Crown lease was nonnegotiable as to minimum gallonage requirements, he nonetheless readily admitted that he never even attempted such negotiations with Crown. As a result, plaintiff jumps to the hasty conclusion that the lease was a firm contract. Second, plaintiff never in good faith attempted to follow Crown's advice to lower his prices to see what might have occurred. Had plaintiff actually complied with Crown's request and *then* showed that his sales volume remained below the minimum, he would be in a far better posture before this Court. As it was, all plaintiff did was take his own independent survey as to his competitiveness and draw his own conclusions about area competition which was taking away some of his gallonage. While Crown acknowledged that some of plaintiff's loss of sales might be attributed to the influx of self-service stations into his general market area, plaintiff was still contractually obligated to utilize his best efforts in achieving maximum sales volume.

Crown increased plaintiff's minimum gallonage requirement in March, 1977 from 203,700 gallons to 224,100 gallons per month. This automatic increase resulted from Malone's having exceeded the minimum gallonage requirement of his 1976 contract. Unfortunately, the following month, plaintiff missed his minimum for the first time. If there is anything seriously disturbing about this case it is the apparent fact that plaintiff has failed to meet his contractual requirement only because he has succeeded too well. Previous above-minimum sales led automatically to a higher monthly gallonage minimum, and plaintiff's troubles all stemmed from having to meet this much higher minimum on a regular basis. Admittedly, he did technically breach his contract, and Crown repeatedly

lowered the minimum when it discovered that road resurfacing and winter weather conditions would reduce plaintiff's monthly volume. At the same time, however, the Court feels that under the "best efforts" requirements of his contract with Crown, Malone had an obligation to follow Crown's marketing suggestions as part of his best efforts obligation to maximize his volume. Had he at least tried this and failed, he would have been able to demonstrate in a more conclusive fashion that his decrease in sales was due to reasons other than his own failure to reduce prices. As such, the Court concludes that plaintiff did breach his lease agreement with Crown and that his failure to meet the minimum gallonage requirement resulted from his own decision not to use his best efforts in complying with Crown's valid marketing strategy. Plaintiff admittedly made the decision not to comply with Crown's suggestions and this decision was clearly within his reasonable control. His termination by Crown therefore complied in all respects with the requirements of the PMPA.

■ While the purpose of the PMPA may have been "to make preliminary injunctions easier to obtain than they otherwise would be, . . . this is not to say that they will be issued as a matter of course. The only time that a court must grant such an injunction is when the statutory requirements are met." *Saad v. Shell Oil Co.*, 460 F.Supp. 114, 117 (E.D.Mich.1978).

Finally, having said all of the above in connection with the merits of this case, the Court is compelled to add a few additional comments about the wisdom of having litigated this case to the end. While plaintiff undoubtedly breached his contract, it seems that Crown has overreacted considerably to plaintiff's shortcomings. There can be no doubt that Malone ran a clean, efficient, and profitable Crown station—profitable for both himself and Crown. While Crown officials stated that they have people literally waiting in line to become Crown franchisees, it is doubtful that they can find a more conscientious retailer than Malone.

Furthermore, in light of radical changes in petroleum availability in recent months, the focus may well shift away from minimum retailer sales to maximum allocations from wholesalers to retailers. There has already been commentary in the media that Crown may cut its allocations to its retailers by some 10% of its 1978 allocations. Should this occur and the scarcity continue, Crown may one day discover that it has sacrificed one of its best retailers for nothing.

Although the scope of equity is broad, the Court does not find that changed conditions occurring after plaintiff's notice of termination warrant imposing upon the parties the temporary cooling-off period which it suggested as a possible settlement. Both sides will have to live as best as they can with today's final ruling.

Accordingly, it is this 5th day of June, 1979, by the United States District Court for the District of Maryland, ORDERED: that plaintiff's request for a declaratory judgment and injunction preventing Crown from terminating his Lease and Dealer Agreement and franchise be, and the same is, hereby DENIED.