Paul G. EDEN, et al.

v.

**TEXACO REFINING AND MARKETING INC.**

Civ. A. No. N–86–2387.

United States District Court,
D. Maryland.

Oct. 15, 1986.

Order Withdrawing Memorandum
Dec. 19, 1986.

Harry C. Storm, Bethesda, Md., for plaintiffs.

K. Donald Proctor and Virginia W. Barnhardt, and Miles and Stockbridge of Baltimore, Md., for defendant.

## MEMORANDUM

NORTHROP, Senior District Judge.

■ Plaintiffs filed this action against defendant seeking damages and injunctive relief. In the amended complaint, plaintiffs allege that defendant has failed to renew the franchise relationship between the parties in violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* (hereinafter "PMPA") and the Maryland Gasohol and Gasoline Product Marketing Act, Md.Comm.Law Code Ann., § 11–301 *et seq.* (hereinafter "Maryland Act"). The provision of the Maryland Act concerning notice of nonrenewal need not be considered. To the extent this provision differs from the PMPA, it has been expressly preempted. 15 U.S.C. § 2806(a); *See also*

*Lanham v. Amoco Oil Co.*, 481 F.Supp. 405, 406 n. 2 (D.Md.1979). Jurisdiction thus exists under 15 U.S.C. § 2805(a).[1] The matters currently before this Court are plaintiffs' motion for preliminary injunction and defendant's motion for declaratory relief. Defendant expressly requested a ruling on the motion for declaratory relief. Because both motions raise the same factual and legal issues, granting one necessarily requires denying the other. A hearing was held on October 10, 1986. Based on the testimony and evidence presented at the hearing, the plaintiffs' motion will be granted and the defendant's motion will be denied. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court hereby files its findings of fact and conclusions of law solely for the purpose of the preliminary injunction and declaratory relief. The Court intimates no opinions and makes no conclusions which bind the parties on the merits of this case.

## I. The Facts

Plaintiff, Paul G. Eden, is a general partner in plaintiff Eden Services, a Maryland general partnership. While the defendant does not admit having any relationship with Eden Services, the effect of granting the preliminary injunction is not disturbed by this dispute. Therefore, the Court will refer to the plaintiffs collectively as "Eden".

Defendant, Texaco Refining & Marketing, Inc. (hereinafter "Texaco") is a Delaware corporation engaged in the business of refining and marketing petroleum and petroleum-related products. Texaco sells and distributes its products, under the Texaco trademark, to franchise retailers in the State of Maryland. It is a franchisor under

---

1. Plaintiffs also assert jurisdiction under 28 U.S.C. Section 1337 which states:

    The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

    The defendant contests jurisdiction under this section. While this section is important when

an Act of Congress does not have its own jurisdiction conferring provision, this section adds nothing to an Act of Congress which does. *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2nd Cir. 1975). In the instant case, since jurisdiction exists under the PMPA, the assertion of jurisdiction under section 1337 is superfluous and irrelevant to the disposition of the pending matters.

the provisions of the PMPA, 15 U.S.C. § 2801(3).

Texaco owns a retail service station located at 7301 Landover Road, Kent Village, in Prince George's County, Maryland. Prior to June, 1984, Texaco leased the premises to Robert Baeschlin and Clifford Piercy, who operated the service station business, selling Texaco gasoline under the terms of a Lease and Agreement of Sale which were to expire on July 31, 1986. In June 1984, the Lease and Agreement of Sale were assigned to Eden, effective August 9, 1984, with Texaco's consent. From June 1984 to the time of this litigation, Eden has operated the Landover Road service station, as a Texaco franchisee, under the name Kent Village Texaco.

In early 1986, according to Fred Eden, father of Paul Eden and a partner in Eden Services, Eden requested and received a proposed new franchise agreement from Texaco, with blank spaces for rent, minimum gallonage, hours of operation and other items. Because the proposed agreement was substantially different from the existing agreement, Mr. Eden immediately asked his Texaco representative, Ron Woodfolk, about the possibility of negotiating with Texaco. Mr. Eden asserts that Mr. Woodfolk indicated that negotiations were possible, but that Milton Price, a Texaco area manager, was the only person with authority to negotiate changes. Mr. Price agrees that he, and not Mr. Woodfolk, had the authority to negotiate and make changes in the proposed agreement. According to Mr. Eden, the meeting to discuss the new agreement with Mr. Price, was requested and took place in March. However, Mr. Eden alleges, that the entire meeting was used by Mr. Price to express displeasure over Eden's marketing and pricing policies and to discuss the possibility of converting the station to a Texaco System 2000, "an advanced marketing location," which involved having a food bar, car wash and self-service pumps at the station. Mr. Price does not dispute the fact that the March meeting was used entirely to discuss the conversion of the station. Mr. Eden and Mr. Price each blame the other for the fact that the meeting was not used for its intended purpose—that is, to discuss the proposed agreement. This factual dispute, if relevant, is a question for the jury. It is, however, undisputed that there was no discussion about the proposed agreement, and that the meeting ended with assurances that a future meeting would be held for such purpose.

On March 31, 1986, Eden received from Texaco a proposed renewal franchise agreement, with all of the blanks filled in with figures, to take effect upon the expiration of the existing franchise agreement. The terms of the proposed franchise agreement differ substantially from the terms of the franchise agreement under which the parties had been operating. In particular, the proposed agreement states that both parties agree that the occurrence of any one of an extensive list of events is reasonable and material to the franchise relationship and furnished grounds for termination.

A month later, on April 29, 1986, Eden received from Texaco a letter dated April 28, 1986, notifying Eden that the franchise relationship would not be renewed. The reason for the nonrenewal, given in the letter, was "the failure of [Eden] and Texaco to agree to changes or additions to the provisions of the [proposed franchise] agreement, which changes or additions were the result of determinations made by Texaco in good faith and in the normal course of business." Both parties agree that no negotiations concerning the new agreement occurred between Eden's receipt of the proposed new franchise agreement on March 31, 1986, and Eden's receipt of the notice on April 29, 1986. Eden asserts that immediately after receiving the April 28th notice, Mr. Woodfolk was contacted and advised Eden that the notice was a "technicality" and "not to worry about it." According to the proffered testimony of Mr. Woodfolk, he did not make these statements, but did say the notice "meant exactly what it said." Mr. Price testified that he, too, spoke with Mr. Eden soon after the notice was sent and told Mr.

Eden that, because Texaco had not received an executed copy of the proposed franchise agreement, it was required to send the notice of nonrenewal. Mr. Eden repeatedly testified that he was led to believe, and expressly told, that the notice was a "technicality" designed to keep Texaco within the requirements of the PMPA, of which Mr. Eden claims, he had only a slight understanding.

During the next couple of months, Eden claims to have attempted to meet with Texaco representatives to discuss the various terms in the proposed agreement and was continually assured that there would be an opportunity to do so. Texaco does not dispute this. Both parties agree that two meetings were held in May. According to Mr. Price, both meetings centered on how to improve the service station's viability as a business venture for Texaco and on how to attract more customers. According to Mr. Eden's testimony, Mr. Price indicated at these meetings, that Eden was "confrontational" and that Texaco was displeased with Eden's pricing policies. No discussions relating to the proposed franchise agreement took place at those two meetings. The parties, again, dispute the reasons for the lack of such discussions.

Mr. Eden sent a letter dated July 10, 1986, to Mr. Price formally requesting that the parties meet to negotiate the proposed franchise agreement. On July 16, 1986, Mr. Woodfolk called Mr. Eden to set up a meeting on the next day. According to Mr. Eden's testimony, he was given too little notice to prepare for the next day's meeting and therefore, although a meeting was held, no substantive discussions took place. Mr. Price did state at this meeting that he had the authority to negotiate the agreement.

Finally, on July 25, 1986, Messrs. Price and Eden met in Mr. Price's office to discuss specifically the terms of the proposed franchise agreement. At that meeting, Mr. Price claims that Texaco was willing to negotiate the minimum gallonage requirements, the right of survivorship clause and the hours of operation. Mr. Price claims

that Mr. Eden was dissatisfied with the hours of operation provision, since the agreement under which the parties had been operating required no minimum hours of operation, although Eden had chosen to keep the station open twenty-four hours. The ultimate outcome of this meeting is unclear. Despite Mr. Price's authority to make changes to the agreement and Texaco's alleged willingness to negotiate, no actual changes were made. According to Mr. Eden, Texaco advised Eden that the terms in the proposed agreement were not negotiable but that Texaco would "look into" the possibility of making certain changes. Mr. Price claims that the parties agreed to "get back to each other," however, there was no further contact between the parties on this matter. Texaco did state at this meeting, that it would not withdraw its notice of nonrenewal.

On July 31, 1986, Eden returned an executed copy of the proposed franchise agreement to Texaco, under protest, and filed this action. Texaco executed the agreement, and on August 5, 1986, returned an executed copy to Eden with a letter stating that Texaco considered Mr. Eden's execution of the franchise agreement as his intention to be bound by all the terms therein. Eden responded in a letter dated August 8, 1986, informing Texaco that Eden's position remained unchanged. On August 18, 1986, Texaco retroactively reinstated its notice of nonrenewal.

On September 2, 1986, Texaco demanded possession of the premises, which was refused by Eden. Since September 1, 1986, Texaco has refused to deliver gasoline and other products to Eden, and refuses to recognize Eden as a franchisee.

## II. Issues

In support of the motion for preliminary injunction, Eden contends that the nonrenewal notice is deficient in that the purported reason for nonrenewal did not exist at the time the notice was given. Specifically, Eden claims that, because the parties did not discuss the terms of the proposed franchise agreement prior to the April 28th notice of nonrenewal, the reason for nonre-

newal—the alleged inability of the parties to agree to changes—was non-existent. Because Texaco lacked any reason to withhold renewal of the franchise relationship at the time notice was sent, Eden contends that Texaco has failed to comply with the procedural prerequisites of the notice provision of the PMPA. Furthermore, Eden maintains that the notification was sent in bad faith as a pretext for coercing Eden's consent to the changes contained in the proposed franchise agreement. Lastly, Eden claims that the changes in the proposed franchise agreement were not made in good faith in that the proposed agreement attempts to secure Eden's acquiescence to various terms that are "reasonable and of material significance", in violation of the PMPA and imposes mandatory hours of operation without negotiation, in violation of section 11–304(d) of the Maryland Act.

Texaco contends that Eden is not entitled to a preliminary injunction because the PMPA does not require a franchisor to negotiate with its franchisee in renewing a franchise relationship. From this contention, Texaco argues that Eden's failure to execute the agreement as of April 28, 1986, evidences the parties' failure to agree to the changes and additions in the proposed agreement, thereby furnishing grounds for nonrenewal. Additionally, Texaco asserts that the terms in the proposed agreement

do not demonstrate bad faith since there is evidence that Texaco did not discriminate against Eden. In support of this assertion, Texaco claims that the proposed agreement was used on a nationwide basis and that eighty percent of the retailers in Eden's area have executed the new agreement. Finally, Texaco contends that Eden is precluded from the benefits of a preliminary injunction under the PMPA as a matter of law.

### III. Background of the PMPA

Before addressing the merits of the issues raised by the parties, it would be of some assistance to discuss the purpose of the PMPA. In 1978, Congress enacted the PMPA in order "to establish minimum federal standards governing the termination and non-renewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." S.Rep. No. 95–731, 95th Cong., 2d Sess. 15 (1978) U.S. Code Cong. & Admin.News, p. 873. The primary goals of the Act are "to remedy the extreme disparity of bargaining power between refiners and dealers", *id.; Gruber v. Mobile Oil Corp.*, 570 F.Supp. 1088, 1091 (E.D.Mich.1983), and to protect gasoline dealer-franchisees against arbitrary or discriminatory termination or nonrenewal of franchises. *See Davy v. Murphy Oil Corp.*, 488 F.Supp. 1013, 1015 (W.D.Mich. 1980); *Munn v. Amoco Oil Co.*, 488 F.Supp. 1114, 1118, (D.Conn.1980).[2] To ef-

---

**2.** The pertinent legislative history of the PMPA is as follows:

"The franchise relationship in the petroleum industry is unusual, in fact, perhaps unique, in that the franchisor commonly not only grants a trademark license but often controls, and leases to the franchisee, the real estate premises used by the franchisee. In addition the franchisor almost always is the primary, even exclusive, supplier of the franchisee's principal sale item: motor fuel. This relationship is, therefore, often complex and characterized by at times competing interests.

The natural tensions which are created by this relationship have led to numerous complaints by franchisees of unfair terminations or non-renewals of their franchises by franchisors for arbitrary and even discriminatory reasons. Numerous allegations have been made before congressional committees investigating petroleum marketing problems that terminations and non-renewals, *or threats of termination or non-re-*

*newal, have been used by franchisors to compel franchisees to comply with marketing policies of the franchisor.*

Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the franchisor and the franchisee. *This disparity results in franchise agreements which some franchisees have argued amount to contracts of adhesion.* The provisions of the contracts between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity of bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor.

It is important to note that while the relationship of the parties to a motor fuel franchise agreement is basically contractual in nature, normal remedies for violations of the contractu-

fectuate these goals, the Act mandates strict compliance with the notice requirements it imposes on a terminating or nonrenewing franchisor, *see* 15 U.S.C. § 2804, and prohibits a franchisor from terminating or refusing to renew a franchise, except for the reasons specified in the Act, *see* 15 U.S.C. § 2802.

The Act, then, "is directed at the how and why of ending a franchise." *Lasko v. Consumers Petroleum of Conn., Inc.*, 547 F.Supp. 211, 216 (D.Conn.1981).

### IV. Application of the PMPA

#### A. *Notice and Grounds for Nonrenewal*

The PMPA permits nonrenewal of a franchise or lease only if the procedural and substantive prerequisites of section 2802(b)(1) are met. Section 2802 provides that a franchisor cannot refuse to renew a franchise relationship unless "(A) the notification requirements of section 2804 of this Act are met; and (B) such ... nonrenewal is based upon a ground in paragraph (2) or (3)."

The manner and form of notification mandated by the Act, as set forth in section 2804 requires that notice of nonrenewal be sent "not less than 90 days prior to the date on which such ... nonrenewal takes effect. 15 U.S.C. § 2804(a)(2). In addition, notification must be made in "writing" by "certified mail or personal delivery," and should contain a "statement of intention not to renew together with the reasons therefor," the "date on which such nonre-

newal shall take effect," and a summary of the Petroleum Marketing Practices Act as prepared by the Secretary of Energy. 15 U.S.C. § 2804(c).

Eden does not contend that Texaco's notice of nonrenewal was untimely or failed, in form, to satisfy the requirement of the PMPA. Rather, Eden contends that the reason for nonrenewal given by Texaco does not satisfy the statutory requirements set forth in section 2802(b)(3) which is the section relied on by Texaco to support its position that its notification complied with the PMPA.

Section 2802(b)(3) provides, in part, as follows:

> For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship;
>
> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise if;
>
> (i) Such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
>
> (ii) Such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

■ Since Texaco was permitted to refuse to renew the franchise relationship based only upon the grounds set forth in

---

al provisions are often eschewed by the franchisor. The disparity of bargaining power which disadvantages the franchisee in negotiations leading to execution of the franchise agreement manifests itself in the contractually provided remedies for contract violations or changes in circumstances. *Commonly the franchisor is able to capitalize on his disparity of bargaining power to obtain great flexibility with respect to his rights to terminate the contractual relationship. As a result, termination of franchise agreements during the term as a remedy for contract violations has been repeatedly utilized.*

\* \* \* \* \* \*

Just as disparity of bargaining power at the commencement of the franchise relationship may manifest itself in the utilization of termi-

nation as a remedy for contract violations, *the prospect of non-renewal of the franchise relationship hangs over the relationship and may manifest itself during the franchise term as a means by which the franchisor may compel the franchisee to comply with the franchisor's marketing policies.* Actual threats of non-renewal are not essential to the leverage the prospect of non-renewal provides a franchisor over the activities of a franchisee. The prospect is ever present and the franchisee can readily comprehend the implications of departing from the marketing policies of the franchisor, even if in some cases those policies are contrary to the franchisee's economic interests...." (emphasis added)

S.Rep. No. 95–731, 95th Cong., 2d Sess. 18, *reprinted,* 1978 U.S.Code Cong. & Ad.News 873, 875–77.

section 2802(b)(3),[3] it was essential that the reasons for the nonrenewal be specific and unambiguous. so that Eden could have determined if there was compliance with the PMPA. *See Davy,* 488 F.Supp. at. 1015.

■ In light of the communications preceding and following the notice of nonrenewal, said notice can only be described as inaccurate and ambiguous. In the notice of nonrenewal, Texaco states that the parties are unable to agree to the changes and additions in the proposed agreement. As Eden points out, however, prior to Eden's receiving the notice of nonrenewal, Texaco agreed to conduct negotiations with Eden concerning the new agreement, but upon meeting in March for this purpose, Texaco used this opportunity to discuss the lack of harmony between the parties over issues unrelated to the proposed agreement. According to Eden, Texaco continued to assure Eden prior to and after receipt of the notification of nonrenewal, that the parties would meet to negotiate. These allegations, which Texaco does not adequately address, completely undermine the accuracy of the statement in the April 28, 1986, notice of nonrenewal that the parties failed to agree to changes in the proposed agreement. As of April 28th, this Court finds that the best description of the situation is that Eden and Texaco planned, but had not had the opportunity, to agree or disagree on the proposed agreement. That situation is not a ground for nonrenewal recognized under the PMPA. Therefore, the Court agrees with Eden that, at the time the nonrenewal was sent, the reason on which it was based did not exist and Texaco was not permitted to base its decision not to renew on the fact that the parties might not agree in the future.

■ In support of this conclusion, the Court is persuaded by the opinion in *Davy, supra.* In that case, the franchisor sent a 90–day notice of nonrenewal which, while not specifying reasons for the nonrenewal, stated that the franchisor's sales represent-

ative would be in contact with the franchisee in the near future to discuss terms of a new lease. The franchisee sought injunctive relief against nonrenewal of the franchise. The franchisor argued that any deficiency in the notice (the absence of a ground for nonrenewal at the time notice was given) should be overlooked because, at the time of termination, proper grounds existed, in that the parties failed to agree on changes in the amount of the rental. The Court, in rejecting this argument, stated:

> The Court understands that the reason for the nonrenewal, based upon the testimony of the defendant's witness, was failure of the parties to agree with respect to rental provisions of the lease. From the evidence, the Court finds that at the time the Notice was given, defendant did not know whether a new lease agreement would be negotiated. *Defendant is not free to anticipate that the parties will not be able to agree on a new lease and, therefore, anticipate that the nonrenewal is based upon a ground set forth in the Act.*

488 F.Supp. at 1017 (emphasis added). According to the testimony of Texaco's own representative, Milton Price, Texaco had no reason to believe, at the time the April 28th notice was sent, that Eden would not sign the new agreement.

Texaco's argument that the reason for the nonrenewal did exist at the time notice was sent, because Eden had not yet executed the new agreement and Texaco was under no obligation to negotiate, is without merit and cannot overcome the clear intent of the PMPA to remedy the extreme disparity of bargaining power between franchisors and franchisees in the petroleum industry. Texaco relies on *Meyer v. Amerada Hess Corp.,* 541 F.Supp. 321 (D.N.J. 1982). In that case, the court denied injunctive relief to a franchisee who sought to enjoin a franchisor from enforcing the rent obligations under a new franchise

---

**3.** A franchisor may also refuse to renew a franchise agreement based on the grounds in section 2802(b)(2). That section, however, is not applicable to the facts surrounding the nonrenewal in the instant case.

agreement which the franchisee had executed. In determining, based on an extensive record, that the franchisor's rental increases were not discriminatory, the Court in *Meyer* stated that the fact that the new terms were presented on a "take it or leave it" basis does not constitute a lack of good faith. *Id.* at 330. The fact that the *Meyer* court held that the presentment of new terms on a "take it or leave it basis" did not violate the good faith requirement of section 2802(b)(3)(A)(i) in no way addresses or obviates the need for the parties to attempt to negotiate the new terms prior to a determination, pursuant to 2802(b)(3)(A), that the parties have failed to agree. Furthermore, the *Meyer* court is in a distinct minority. Other courts have not permitted the "take it or leave it" approach of *Meyer.* Instead, they interpret the PMPA to require meaningful negotiations prior to the presentment and execution of franchise agreements. *See e.g. Lyons v. Mobile Oil Corp.,* 526 F.Supp. 961, 964 (D.Conn.1981).

Texaco argues that it was compelled to give notice on April 28, 1986, so as to comply with the technical nonrenewal requirements of the PMPA. In some situations, the Court might be persuaded by this argument. However, on the evidence present in the case at bar, the Court is of the opinion that Texaco's notice of termination was intended and designed as an artifice to provide Texaco with negotiating leverage. The Court re-emphasizes that this finding is solely for the purpose of the preliminary injunction. The Court so finds and is persuaded by Eden's contentions, which are not directly refuted by Texaco, that, prior to determining not to renew, Texaco agreed to negotiate but did not do so and by Eden's repeated assertion that Texaco continually attempted to discuss and alter Eden's marketing and pricing policies.

In addition to the procedural and substantive problems raised by the notice of nonrenewal, Eden contends that there are genuine issues relating to Texaco's good faith and overall intention regarding the terms in the proposed agreement. Eden claims that the lease agreement amounts to a contract of adhesion. In support of this charge, Eden makes reference to various terms in the proposed lease which Eden was contractually obligated to agree were "reasonable and of material significance" and furnished "good cause" for termination of the franchise relationship. Furthermore, Eden charges, those terms were presented without any meaningful negotiations. The lack of meaningful negotiation not only violates the intention of the PMPA, according to Eden, but also circumvents the protection of section 11–304(d) of the Maryland Act, which requires negotiations between the parties, in good faith, prior to determining a service station's hours of operation.

■ Because the Court finds that serious questions exist concerning the validity of notice of nonrenewal, it is not necessary to address, in detail, the additional claims of Eden mentioned above. However, the Court notes that, contrary to the position taken by Texaco, an agreement which attempts to define an event as reasonable and materially significant to the franchise agreement is invalid as being contrary to the purposes of the PMPA. *Lyons,* 526 F.Supp. at 964–68. Texaco's reference to *Malone v. Crown Central Petroleum Corp.,* 474 F.Supp. 306 (D.Md.1979), does not persuade this Court otherwise. In that case, after failing to meet the minimum gallonage requirements, the franchisee sought an injunction to prevent termination of the franchise by arguing, *inter alia,* that the minimum gallonage requirements were unreasonable and irrelevant to the franchise relationship. As stated in *Lyons:*

> The fact that the court in *Malone* upheld that provision of the franchise agreement is irrelevant to the issue here. The PMPA does not prevent the parties from entering into a contract. It is concerned with the termination of the franchise relationship. There is a vital distinction between the failure by a franchisee to comply with a provision in a contract and the parties agreeing that an event is one that is relevant to the franchise relationship. The statutory language concerning

the former situation contemplates the existence of a contract. The latter situation contemplates the occurrence of an event outside the basic elements contained in the franchise agreement. *Id.* at 965.[4]

▪ The Court also finds, despite Texaco's assertion to the contrary, that section 11–304(d) of the Maryland Act has not been preempted by the PMPA. The PMPA preempts state law only to the extent that it attempts to apply to the termination or nonrenewal of a petroleum franchise relationship. 15 U.S.C. § 2806. The State law at issue here does not relate to termination or nonrenewal but rather it relates to the obligations of the parties to negotiate in good faith over a service station's hours of operation. This section is consistent with the goal of the PMPA, which is to "equalize the relative bargaining strengths of oil company franchisors and individual franchisees." *Frisard v. Texaco, Inc.,* 460 F.Supp. 1094, 1097 (E.D.La.1978). Eden's claim that Texaco failed to negotiate the provision governing the hours of operation at Eden's service station in good faith, in that Texaco waited until two weeks prior to the expiration of the franchise relationship before even attempting to discuss this provision, raises serious questions concerning the propriety of Texaco's conduct, to which Texaco has not adequately responded.

▪ Section 2802(b)(3)(A) of the PMPA requires that a franchisor put forth changes or additions to the provisions of the franchise "in good faith and in the normal course of business." The legislative history of this provision makes clear that it is the subjective intent of the franchisor which is to be scrutinized by the courts, in determining whether the franchisor has acted in good faith. S.Rep. No. 95–731, 95th Cong., 2d Sess. 37, *reprinted,* 1978 U.S.Code Cong. & Ad.News 873, 895.

This good faith test is meant *to preclude sham determinations from being used as an artifice for termination or non-renewal.* The second test is whether the determination was made "in the normal course of business." Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. *These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Id.* (emphasis added)

"As a matter of necessity, subjective intent is usually a matter of inference to be derived from all of the objective facts and evidence." *Tiller v. Amerada Hess Corp.,* 540 F.Supp. 160, 165 (D.S.C.1981). While Texaco presented evidence that the proposed agreement at issue in the instant case was a standardized form accepted by eighty percent of the dealers in the Texaco regional division in which Eden is located, that is not in and of itself conclusive on the issue of good faith. *See e.g., Tiller, supra.*

▪ The Court concludes from the manner in which the proposed lease agreement was drafted and presented to Eden, that it can be reasonably inferred that Texaco acted in bad faith. It appears that Texaco was attempting to force Eden's concession to the new agreement. In this procedural posture, the Court finds that the proposed franchise agreement may violate the PMPA and the Maryland Act and Texaco's conduct may have been a pretext to its desire to force Eden to comply with Texaco's marketing and pricing policies.

B. *The Standard for Preliminary Injunction*

As part of the general scheme for protecting franchisees, the PMPA "establishes

---

**4.** The fact that the *Lyons* case involved section 2802(b)(2)(C) and the *Malone* case involved section 2802(b)(2)(A) is of no consequence since both sections pertain to the preconditions for termination or nonrenewal. The crucial distinction between these cases is that, in *Lyons,* as is the case here, the franchisor sought to define events as being significant enough to the franchise so as to furnish grounds for nonrenewal or termination prior to the execution of the agreement and without meaningful negotiations. Whereas, in *Malone,* unlike the case here, the Court was called upon to determine if an event, which had already occurred, was significant enough to the franchise so as to be the grounds for nonrenewal.

a liberal standard for the issuance of a preliminary injunction." *Lyons*, 526 F.Supp. at 968. The applicable standard is explained in *Mobile Oil Corp. v. Vachon*, 580 F.Supp. 153, 156 (D.Mass.1983), as follows:

> The standard for injunctive relief under the PMPA is found in Sec. 2805(b)(2) which provides:
>
>> Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if—
>>
>> (A) the franchisee shows—
>>
>> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party is not renewed, and
>>
>> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>>
>> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.
>
> It is clear from the statute that no showing of irreparable harm is required. Even if irreparable harm were a requirement, the granting of injunctive relief would not be precluded. It has been held that the mere loss of a franchise is irreparable harm. *Stenberg v. Checker Oil Co.*, 573 F.2d 921 (6th Cir.1978); *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1304 (D.Minn.1979); *Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971); *Wojciechowski v. Amoco Oil Co.*, 483 F.Supp. 109, 116 (1980). Nor does the franchisee have to show a probability of success on the merits. He need only show some reasonable chance of success on the merits. *Saad v. Shell Oil Co.*, 460 F.Supp. 114, 116 (E.D.Mich.1978). The franchisee, in the language of the statute, must present a case which raises sufficiently serious questions going to the merits of the case. The courts must also look at the balance of the hardships. If there is less hardship imposed upon the franchisor than upon the franchisee by granting the injunction, the court must consider this state of affairs in evaluation of the necessity for injunctive relief. It is a point in the franchisee's favor. *See Gilderhus v. Amoco Oil Co.*, *supra* at 1304; *Daniels v. Dilmar Oil Co.*, 502 F.Supp. 178, 181 (1980); *Wojciechowski v. Amoco Oil Co.*, *supra* at 112; *Wesley v. Mobil Oil Corp.*, 513 F.Supp. 227, 231 (1981).

■ Applying the above test to the facts here, injunctive relief should issue. The first prong of the test, that the franchise has been terminated, has clearly been met. There is no dispute concerning this fact. The second part of the test has also been met. There exist several serious questions, both procedural and substantive, about the validity of Texaco's notice, the basis *vel non* for the nonrenewal, and Texaco's apparent lack of good faith. Finally, the balance of hardships clearly favors granting the injunction. Eden is operating the station profitably, both for itself and Texaco, and continues to pay rent for use of the premises. Thus, Texaco remains in the same position if the injunction issues.[5] Eden, however, faces the total loss of a business on which Eden has allegedly invested substantial labor and money to acquire and promote. Thus, "any hardship imposed upon [Texaco] is negligible compared to the hardship that would be imposed upon [Eden] were the court to deny [its] motion for a preliminary injunction." *Lyons*, 526 F.Supp. at 968.

## V. Conclusion

The statutory standard governing the issuance of a preliminary injunction under the PMPA has been met. Therefore, this Court will grant the plaintiff a preliminary

---

5. Texaco claims that Eden has now debranded the service station. To the extent that this is true, Eden will be required to reinstate Texaco's trademark and use Texaco's products in compliance with the parties' franchise relationship.

injunction enjoining the defendant from nonrenewing the Lease and Agreement of Sale dated June 1, 1984, until further order of this Court. Because of plaintiffs' entitlement to injunctive relief, the Court, by necessity, must deny the defendant's motion for declaratory relief at this time.

## PRELIMINARY INJUNCTION AND ORDER

In accordance with the foregoing Memorandum, and for the reasons stated in open Court on October 10, 1986, IT IS, by the United States District Court for the District of Maryland, ORDERED:

1. That plaintiff's motion for preliminary injunction BE, and the same hereby IS, GRANTED;

2. That defendant's motion for declaratory relief BE, and the same hereby IS, DENIED without prejudice to defendant's right to renew said motion;

3. That defendant BE and hereby IS enjoined from not renewing the Lease and Agreement of Sale dated June 1, 1984, until further order of this Court; and

4. That the preliminary injunction shall become effective upon the posting by the plaintiffs of a bond satisfactory to the Court pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, and permissible under section 2805(b)(3) of the Petroleum Marketing Practices Act, in the amount of $6,000.00.

5. That the Clerk of Court shall mail copies of this Order and the foregoing Memorandum to counsel in this case.

## ORDER

Upon further proceedings, it is this 19th day of December, 1986, by the United States District Court for the District of Maryland,

ORDERED that the Preliminary Injunction issued herein on October 15, 1986 be and hereby is dissolved, and that this Court's Order and Memorandum of October 15, 1986 be and hereby are withdrawn.