**Francisco S. JIMENEZ**

v.

**B.P. OIL, INC.**

**Carlos HORCASITAS**

v.

**B.P. OIL, INC.**

**James G. PALMER, et al.**

v.

**B.P. OIL, INC.**

Civ. Nos. JFM–86–785, JFM–86–818 and JFM–86–1007.

United States District Court, D. Maryland.

Jan. 7, 1987.

Harry C. Storm, Abrams, West & Storm, Bethesda, Md., for plaintiffs.

John Lewin, Nell Strachan, Venable, Baetjer and Howard, Baltimore, Md., for defendants B.P.

Morton A. Sacks, Baltimore, Md., for defendants Crown Central.

## MEMORANDUM

MOTZ, District Judge.

Plaintiffs are former franchisees of B.P. Oil, Inc. who operated retail service stations for B.P. before B.P. withdrew from the Baltimore-Washington market in April 1986. Plaintiffs allege (1) that B.P.'s termination of the franchises was in violation

of section 102(b)(2)(E) of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. section 2802(b)(2)(E), and (2) that B.P. is liable to them under section 11–304(i) of the Maryland Gasohol and Gasoline Products Marketing Act ("The Maryland Act") for the value of any business goodwill which they enjoyed at the time that they were notified of the termination of their franchises.[1] The parties have cross-moved for summary judgment on both of these claims.

### FACTS

From 1979 to 1985, gasoline pumped annually at nearly all BP area stations had been continually decreasing. As a result, in 1985, BP decided that either a market withdrawal or restructuring of the operation of its retail service stations in the Baltimore-Washington area was necessary. On April 18, 1985, BP sent letters to each of its dealers in the area telling them of the situation.

Dealers received one of two types of letters. Both letters told the recipient that BP intended to either restructure its operations, which would involve selling half the stations, or to withdraw from the market completely by selling its interest in all of the area stations to another oil company. Beyond those comments, the content of the two types of letters differed.

If the dealer owned a franchise that BP would keep under a market restructuring plan, the dealer received a "keeper" letter. The letter explained that the dealer would be offered a new BP dealer agreement if a marketing restructuring plan was adopted. The dealer was also told that if BP withdrew from the market its BP franchise would be terminated on October 31, 1985 and the dealer would be offered a non-discriminatory franchise by the oil company purchasing BP's interest. The dealer was

told that he would be informed of the status of BP's plans within the next 180 days.

If the franchise was one BP determined was undesirable to keep, the dealer received a "non-keeper" letter. This letter explained that regardless of what plan BP adopted, the franchise would be terminated on October 31, 1985. The dealer was told that he would either be offered a non-discriminatory franchise by the oil company purchasing BP's interest or be offered an opportunity to purchase the station operated by the dealer. The dealer was told that he would be informed which alternative applied to him within the next 180 days.

On September 26, 1985, BP signed a letter of intent to sell all of its Baltimore-Washington area retail stations to Crown Central Petroleum Corp. The closing date was set as January 31, 1986. BP notified the dealers of the agreement with Crown by letter dated October 17, 1985. That letter also indicated that the termination of the BP franchise agreements was postponed to the closing date. The letter further said that if the Crown deal did not go through, BP would go ahead with its restructuring plan, keeping certain franchises and selling others to the franchisees, as previously indicated by the keeper and non-keeper letters.

On December 23, 1985, Crown sent a letter to each of the BP dealers. Again, several types of letters were sent out. Certain dealers were notified that they would be offered a nondiscriminatory franchise. Other dealers were notified that they would be offered the right to purchase the station they were operating. Several dealers operated more than one franchise. These "multistation" dealers were notified that Crown would offer a nondiscriminatory franchise to them at only one location selected by Crown and that they would be offered the right to purchase the other locations they operated that were not selected. This offer was a result of Crown's

---

1. Plaintiffs initially filed this action before B.P. had withdrawn from the market and sought a temporary injunction against the termination of their franchises. On March 28, 1986 this Court denied that motion. Crown Central Petroleum Corp., to which B.P. transferred its interests in retail service stations in Maryland, was originally named as a defendant but has now been voluntarily dismissed.

corporate policy of not allowing its franchise owners to operate more than one station.

Certain of the dealers accepted the offers made by Crown and others rejected them. B.P.'s withdrawal from the market and Crown's franchises with the former B.P. station operators became effective April 1, 1986.

## DISCUSSION

*PMPA Claim*

The PMPA claim is brought by four multi-station franchisees (Ray, Uzarowski, Chung and Jimenez) who refused the franchise offer made to them by Crown. The focus of their contention is that this offer was untimely under 15 U.S.C. section 2802(b)(2)(E) and that B.P.'s termination of their franchises was therefore unlawful. Section 2802(b)(2)(E) provides as follows:

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(iii) in the case of leased market premises—

(I) the franchisor, during the 180–day period after notification was given pursuant to section 2804 of this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interest in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such person or franchises then in effect and with respect to which such other person is the franchisor.

Plaintiffs argue that under subsection (E)(iii)(I) an offer to purchase a station must be made within 180 days after the notice of termination is given under 15 U.S.C. section 2804. Thus, plaintiffs argue, Crown's offer to purchase was too late since it was made by Crown's letter of December 23, 1985, almost 250 days after B.P.'s initial letter of April 18, 1985 giving notice of termination.[2]

■ Plaintiffs contend that in enacting section 2802(b)(2)(E)(iii), Congress carefully distinguished between offers to purchase and offers of a non-discriminatory franchise. As to offers to purchase, Congress required the offer to be made within 180 days of the notice of termination under subsection (iii)(I); Congress imposed no such time limitation for offers of non-discriminatory franchises under subsection (iii)(II). Plaintiffs vaguely argue that Congress may have drawn this distinction in order to assure that the franchisee "will not suffer continued uncertainty when a market withdrawal is involved." However, plaintiffs assert no concrete basis for the distinction and their argument is little more than chimerical. They cite nothing in the legislative history to show that this was Congress' intent. Moreover, it certainly is not self-evident that it is generally in the interest of franchisees to have the franchisor forced into a situation where it must have its successor offer non-discriminatory

---

**2.** Plaintiffs do not allege that the April 18, 1985 notice was itself in any way untimely.

franchises rather than offer to sell stations where the franchisees had been operating. Likewise, it should not be presumed that Congress had the unrealistic expectation that major market withdrawals which, as the present case demonstrates, necessarily involve financial and legal complexities, can be effected within a six month period.[3]

Rather than try to glean from the statutory language a distinction and imagined reasons for that distinction which is supported neither *a priori* nor by the legislative history, it is preferable to acknowledge the simple fact that subsection (iii) is badly drafted. It seems plain that the time period Congress meant to impose when it referred to "the 180–day period after notification was given pursuant to section 2804 of this title" was "the *more than* 180–day period after notification was given pursuant to section 2804 of this title." All that Congress was trying to do was to describe the sequence in which offers to purchase and offers of non-discriminatory franchises were to be given. If it had meant to mandate that the offer be made within 180 days, it would have expressly said so or, at least, have omitted the word "the" before the words "180–day period."[4] As written, it is clear that the phrase is merely meant to paraphrase what section 2804 says, not to mandate a new deadline.

*Claims For Goodwill Under The Maryland Act*

All plaintiffs claim an entitlement to goodwill under the Maryland Act. There are four different types of stations as to which goodwill is claimed: (1) stations as to which an offer to purchase was made by Crown and accepted by the franchisee; (2) stations as to which an offer to purchase

was made by Crown and rejected by the franchisee; (3) stations as to which an offer of a franchise was made by Crown and accepted by the franchisee; and (4) stations as to which a franchise offer was made by Crown which was rejected by the franchisee.

The relevant section of the Maryland Act provides as follows:

(a) *In general.*—Every marketing agreement is subject to the provisions of this section, whether or not expressly set forth in the agreement. . . .

(i) *Payment for goodwill.*—(1) In addition to the provisions of subsection (h) of this section, if, without written consent of the dealer, the distributor terminates, cancels, or unreasonably refuses to renew the marketing agreement, the distributor shall pay to the dealer the full value of any business goodwill which the dealer enjoys at the time he is notified of the termination, cancellation or refusal to renew.

(2) The distributor shall make the payment required by this subsection within 30 days from the effective date of the termination, cancellation or refusal to renew.

(3) This subsection does not apply if the dealer materially breaches the marketing agreement.

*Maryland Code Ann., Commercial Law Art.,* section 11–304(i). On its face this provision appears to require the payment of goodwill to plaintiffs. B.P. makes several arguments why this is not so.

First, B.P. contends that paragraph 29 of the Dealer License Agreement which it had with its franchisees provides a for-

---

**3.** The premise to plaintiffs' argument that subsection (iii)(I) but not subsection (iii)(II) imposes a 180 day limitation is itself suspect. The phrase "the franchisor, during the 180–day period after notification was given pursuant to section 2804 of this title" does appear only in subsection (iii)(I) and not in subsection (iii)(II). However, in order for subsection (iii)(II) to make any sense, this phrase must be read into it; otherwise there would be no subject or verb in subsection (iii)(II). It is thus evident that Congress intended the subject phrase (including the 180 day time period) to appear in the intro-

ductory clause to subsection (iii) and be applicable to both subsections.

**4.** Of course, a notice given pursuant to section 2804 might become so stale that it is no longer effective. Here, however, it is undisputable that B.P. acted diligently in keeping its franchises advised of the status of its plans and negotiations and that it effected its market withdrawal within a reasonable period of time after announcing its intention to do so.

mula by which a dealer's goodwill is to be measured. It is undisputed that under that formula no goodwill payments are due to plaintiffs. Paragraph 29 might be relevant evidence in determining the factual question of what, if any, goodwill plaintiffs had in their stations. However, it is precisely this type of provision imposed by refiner fiat upon a franchise relationship which both the PMPA and the Maryland Act are designed to protect against. Therefore, to the extent that the formula provided in paragraph 29 is not supportable by independent evidence, it is void.[5]

■ Second, B.P. contends that, in the words of the Maryland Act, what is involved in this case is not a "termination" but "a reasonable non-renewal" for which no payment for goodwill is payable. There is no legislative history to the Maryland Act and both parties frankly concede that it is virtually impossible to determine exactly what the Maryland General Assembly had in mind when it distinguished between "terminations," "cancellations" and "unreasonable non-renewals." The Maryland Act was enacted prior to the PMPA and therefore it cannot automatically be assumed that the words used in the two statutes have the same meaning. By the same token, however, there is reason to assume that the General Assembly—which has not amended section 11–304(i) since the PMPA was enacted—intended that what would be a unlawful non-renewal under federal law could be a reasonable non-renewal under Maryland law. Here, since B.P.'s notice of termination dated April 18, 1985 was not given, as would be required under 15 U.S.C. sections 2804(b)(2), more than 180 days before April 30, 1985 (the expiration date of plaintiffs' franchises),[6] it seems clear that a termination rather than a nonrenewal was involved.

■ Third, B.P. contends that the goodwill provision of the Maryland Act is preempted by the PMPA. See 15 U.S.C. section 2806(a). According to B.P., the section is a "provision of ... law ... with respect to termination" which provides a "remedy or penalty applicable to any violation thereof." Plaintiffs, on the other hand, contend that the goodwill provision of the Maryland Act does not seek to regulate terminations or non-renewals and does not impose any remedy or penalty for its violation. Rather, it simply provides compensation to franchisees for losses which they suffer in the event that their franchises are lawfully brought to an end.[7]

*Bellmore v. Mobil Oil Corp.*, 783 F.2d 300 (2d Cir.1986) is directly on point. There, the Court upheld a provision of the Connecticut Gasoline Dealer's Act essentially comparable to the provision here in question. *Bellmore* is generally in accord with the approach to preemption questions under the PMPA which has been taken by other judges in this district. Where provisions of state law do not conflict with the procedural and enforcement provisions of the PMPA but provide supplemental terms

---

5. B.P. also makes a subsidiary contention that because the sales volume at the stations of all plaintiffs except one declined, plaintiffs have failed to allege facts sufficient to show that they lost any goodwill. Clearly, the question of the value, if any, of the goodwill lost by plaintiffs is a factual one which is inappropriate to resolve by summary judgment, at least on the present state of the record which is entirely undeveloped on that question.

6. The termination date of one of the plaintiffs' franchises was not until June 30, 1986. Undisputably, his franchise was "terminated."

7. It might seem that dealers who accepted a franchise offer from Crown would be unjustly enriched by permitting them to receive a goodwill payment while simultaneously retaining their goodwill by operating a station at the same location. However, this possibly duplicative payment is at least partially offset by the fact that the dealers have had a new franchisor thrust upon them whose franchise agreement includes terms (such as 24 hour service and non-competition provisions) which were not in the B.P. franchise and which the dealers find onerous. Furthermore, in selling its interest in the stations to Crown B.P. was in a position to receive (and may well have received) payment for the goodwill which had been generated at the stations. It certainly is in the province of the Maryland legislature to determine that under such circumstances it is the dealer and not the refiner who should receive compensation for the goodwill.

governing the franchise relationship, they are held not to be preempted. *See, e.g., Eden v. Texaco Refining and Marketing, Inc.,* 644 F.Supp. 1573 (D.Md.1986). This holding is consistent with the view of the Fourth Circuit that preemption should be found only where the state law provision conflict[s] with Congress' objective of establishing "a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises." *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 361 (4th Cir.1986), quoting from S.Rep. No. 731, 95th Cong. 2d Sess. 19, 1978 *U.S.Code Cong. & Admin.News* 877.

For these reasons B.P.'s motion for summary judgment will be granted as to the claims asserted by plaintiffs Ray, Uzarowski, Chung and Jimenez asserting a violation of the PMPA, and plaintiffs' motion for summary judgment will be granted on for their claims for goodwill under the Maryland statute.